UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DEANNA PHOENIX, on behalf of her | ) | CIVIL DOCKET NUMBER:**19-13004** |
| minor daughter, S.W. | ) | |
| | ) | |
| VERSUS | ) | |
| | ) | |
| LAFOURCHE PARISH GOVERNMENT, | ) | SECT: |
| SHERIFF CRAIG WEBRE, | ) | |
| CAPT. CORTELL DAVIS, | ) | |
| MAJOR JEREMY GRANIERE, | ) | |
| LT. CRAIG DENISON, DEPUTY STEPHEN | ) | |
| WALDROP, DEPUTY SAL MARCELLO, | ) | MAG |
| CORRECTHEALTH LAFOURCHE LLC, | ) | |
| DAVID JENNINGS, KENDRA PATRICK, | ) | |
| PATRICIA GUIDRY, KATASHA MORRIS, | ) | |
| AYSA EVERY, SHANTA SHERMAN, | ) | |
| SARAH ARMOND AND CHELSEA NOLAN | ) | |

_____

# **COMPLAINT**

**DEANNA PHOENIX** on behalf of her minor daughter, **S.W.** files this Complaint against the above-named defendants based on their failure to protect Samuel June Williams (hereinafter "Williams) from the risk of harm he posed to himself.  Williams was the father of **S.W.** Williams was a pre-trial detainee in the custody and care of the Lafourche Parish Sheriff's Office (hereinafter "LPSO"). Mr. Williams had a history of mental illness. While at the Lafourche Parish Detention Center (hereinafter "LPDC") Williams expressed suicidal ideation. His prior medical records reflected a history of schizophrenia and bipolar disorder for which he was receiving medication. Nonetheless, the defendants refused to have Williams examined by a psychiatrist or treat his

1

disease with medication. As a direct result of this deliberate indifference Williams committed suicide by hanging on October 7, 2018.

**I.  JURISDICTION**

1.      This action is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343, and the Eighth and Fourteenth Amendments to the Constitution of the United States, Section 504 of the Rehabilitation Act of 1973, which authorizes actions to redress discrimination based on disability and handicap, Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131, 42 U.S.C. § 1988 and 42 U.S.C. § 12205, et seq. Plaintiff also invokes supplemental jurisdiction over claims under state constitutional and statutory law, pursuant to 28 USC §1367.

**II.  PARTIES**

**(Plaintiff)**

2.      **DEANNA PHOENIX on behalf of her minor daughter, S.W.,** is a citizen of the full age of majority of the State of Louisiana and is currently domiciled in St. Tammany Parish, Louisiana. **S.W.** was the daughter of the deceased, Williams.

**(Defendants)**

 Named defendants herein are:

3.      **LAFOURCHE PARISH GOVERNMENT** (hereinafter "**LAFOURCHE PARISH**")**,** is a political entity capable of suing and being sued.  **LAFOURCHE PARISH** is the entity responsible for funding operations of the LPDC, and negotiating, approving, funding and entering into contracts with private companies to provide medical and mental health services at the jail. **LAFOURCHE PARISH** was also responsible for ensuring appropriate access to services and accommodation for all individuals with disabilities as defined by the ADA.

2

4.      Sheriff **CRAIG WEBRE** (hereinafter "**WEBRE**"), a person of the full age of majority and a resident of Lafourche Parish, State of Louisiana, in his individual and official capacity as the Sheriff of Lafourche Parish. At all times described herein, **WEBRE** was the ultimate policymaker for the LPSO, and was responsible for the hiring, training, supervision, discipline and control of appropriate staff to maintain the care, custody, and control of prisoners in the custody of the LPSO. He was responsible for all staffing levels of the LPDC, including contracting with medical providers. He was also responsible for the supervision, administration, policies, practices, customs, operations of LPDC. As the representative for the public entity, LPSO, he was also responsible for ensuring appropriate access to services and accommodation for all individuals with disabilities as defined by the Americans with Disabilities Act. **WEBRE** was and is a final policymaker, and at all pertinent times was acting under color of law. He is liable both directly and vicariously for the actions complained of herein.

5.      Major **JEREMY GRANIERE** (hereinafter "**GRANIERE**"), a person of the full age of majority and a resident of Lafourche Parish, State of Louisiana, in his individual and official capacity as the Corrections Director of the LPSO. At all times described herein, **GRANIERE** was a policymaker for the LPSO, and was responsible for the hiring, training, supervision, discipline and control of appropriate staff to maintain the care, custody, and control of prisoners in the custody of the LPSO. He was responsible for physical plant maintenance at LPDC. He was also responsible for the supervision, administration, policies, practices, customs, operations of LPDC. He was also responsible for ensuring appropriate access to services and accommodation for all individuals with disabilities as defined by the ADA. **GRANIERE** was and is a final policy maker, and at all pertinent times was acting under color of law. He is liable both directly and vicariously for the actions complained of herein.

6.      Capt. **CORTELL DAVIS** (hereinafter "**DAVIS**"), a person of the full age of majority and a resident of Lafourche Parish, State of Louisiana, in his individual and official capacity as the Corrections Director of the LPSO. At all times described herein, **DAVIS** was a policymaker for the LPSO, and was responsible for the hiring, training, supervision, discipline and control of appropriate staff to maintain the care, custody, and control of prisoners in the custody of the LPSO. He was responsible for physical plant maintenance at LPDC. He was also responsible for the supervision, administration, policies, practices, customs, operations of LPDC. He was also responsible for ensuring appropriate access to services and accommodation for all individuals with disabilities as defined by the ADA. **DAVIS** was and is a final policy maker, and at all pertinent times was acting under color of law. He is liable both directly and vicariously for the actions complained of herein.

7.      Lt. **CRAIG DENISON** (hereinafter "**DENISON**"), a person of the full age of majority and a resident of Lafourche Parish, State of Louisiana, in his individual capacity as Shift Supervisor at the LPSO. At all times described herein, **DENISON** was responsible for the training, supervision, discipline and control of the defendants, **STEPHEN WALDROP** and **SAL MARCELLO** who were responsible for the care, custody, and control of prisoners in the custody of the LPSO. He is liable both directly and vicariously for the actions complained of herein.

8.      Deputy **STEPHEN WALDROP** (hereinafter "**WALDROP**") a person of the full age of majority and a resident of Lafourche Parish, State of Louisiana, in his individual capacity. At all pertinent times, Deputy **WALDROP** was employed by the LPSO and/or **WEBRE** and assigned to posts at LPDC where Williams was housed and where he died.  He was responsible for ensuring the appropriate care, custody and control of prisoners, including Williams.

4

9.      Deputy **SAL MARCELLO** (hereinafter "**MARCELLO**") a person of the full age of majority and a resident of Lafourche Parish, State of Louisiana, in his individual capacity. At all pertinent times, Deputy **MARCELLO** was employed by the LPSO and/or **WEBRE** assigned to posts at LPDC where Williams was housed and where he died.  He was responsible for ensuring the appropriate care, custody and control of prisoners, including Williams.

10.     **CORRECTHEALTH LAFOURCHE LLC** (hereinafter "**CORRECTHEALTH LAFOURCHE**") was at all relevant times the entity with which defendant **LAFOURCHE PARISH** and LPSO contracted to provide medical and mental health services to prisoners at the LPDC. On information and belief, **CORRECTHEALTH LAFOURCHE** is operated as a subsidiary of CorrectHealth, LLC.  **CORRECTHEALTH LAFOURCHE** was responsible for provision of all staffing, training, policies and procedures for all medical and mental health personnel at LPDC.

11.     **DAVID JENNINGS** (hereinafter "**JENNINGS**"), sued in his individual capacity, is an adult citizen of the State of Louisiana residing the Eastern District of Louisiana. At all relevant times, **JENNINGS** was an employee of **CORRECTHEALTH LAFOURCHE**.  **JENNINGS** was acting under the direction and supervision of **CORRECTHEALTH LAFOURCHE**. **JENNINGS** was a Social Worker at LPDC.

12.     **KENDRA PATRICK** (hereinafter "**PATRICK**"), sued in her individual capacity, is an adult citizen of the State of Louisiana residing the Eastern District of Louisiana. At all relevant times, **PATRICK** was an employee of **CORRECTHEALTH LAFOURCHE**.  **PATRICK** was acting under the direction and supervision of **CORRECTHEALTH LAFOURCHE**. **PATRICK** was a Nurse Practitioner at LPDC.

13.     **PATRICIA GUIDRY** (hereinafter "**GUIDRY**"), sued in her individual capacity, is an adult citizen of the State of Louisiana residing the Eastern District of Louisiana. At all relevant times, **GUIDRY** was an employee of **CORRECTHEALTH LAFOURCHE**. **GUIDRY** was acting under the direction and supervision of **CORRECTHEALTH LAFOURCHE**. **GUIDRY** was a Licensed Practical Nurse at LPDC.

14.     **KATASHA MORRIS** (hereinafter "**MORRIS**"), sued in her individual capacity, is an adult citizen of the State of Louisiana residing the Eastern District of Louisiana. At all relevant times, **MORRIS** was an employee of **CORRECTHEALTH LAFOURCHE**. **MORRIS** was acting under the direction and supervision of **CORRECTHEALTH LAFOURCHE**. **MORRIS** was a Licensed Practical Nurse at LPDC.

15.     **AYSA EVERY** (hereinafter "**EVERY**"), sued in her individual capacity, is an adult citizen of the State of Louisiana residing the Eastern District of Louisiana. At all relevant times, **EVERY** was an employee of **CORRECTHEALTH LAFOURCHE**. **EVERY** was acting under the direction and supervision of **CORRECTHEALTH LAFOURCHE**. **EVERY** was a Licensed Practical Nurse at LPDC.

16.     **SHANTA SHERMAN** (hereinafter "**SHERMAN**"), sued in her individual capacity, is an adult citizen of the State of Louisiana residing the Eastern District of Louisiana. At all relevant times, **SHERMAN** was an employee of **CORRECTHEALTH LAFOURCHE**. **SHERMAN** was acting under the direction and supervision of **CORRECTHEALTH LAFOURCHE**. **SHERMAN** was a Licensed Practical Nurse at LPDC.

17.     **SARAH ARMOND** (hereinafter "**ARMOND**"), sued in her individual capacity, is an adult citizen of the State of Louisiana residing the Eastern District of Louisiana. At all relevant times, **ARMOND** was an employee of **CORRECTHEALTH LAFOURCHE**. **ARMOND** was

acting under the direction and supervision of **CORRECTHEALTH LAFOURCHCE**. **ARMOND** was a Licensed Practical Nurse at LPDC.

18.     **CHELSEA NOLAN** (hereinafter "**NOLAN**"), sued in her individual capacity, is an adult citizen of the State of Louisiana residing the Eastern District of Louisiana. At all relevant times, **NOLAN** was an employee of **CORRECTHEALTH LAFOURCHE**. **NOLAN** was acting under the direction and supervision of **CORRECTHEALTH LAFOURCHE**. **NOLAN** was a Licensed Practical Nurse at LPDC.

## III.  **FACTUAL ALLEGATIONS**

19.     On September 15, 2018 Williams was arrested and transported to the LPDC. On the same date at approximately 2:50 a.m., the CorrectHealth Lafourche records reflect that he was medically screened by the defendant LPN **EVERY**. According to the "Intake Screening Form", Williams denied thoughts of self-harm and did not exhibit signs that suggested the risk of suicide or self-injurious behavior. He also denied any past and current mental health history or any past or recent suicide attempts or ideations. Accordingly, he was placed in a holding cell. At approximately 0938 hrs he was transferred to F Block. On September 16, 2018 he was transferred to G Block because of issues with another inmate.

20.     On September 18, 2018 Williams informed an unknown correctional officer of the LPDC that he was suicidal. By 8:05 a.m. he was placed on suicide watch by either defendant LPN **SHERMAN** or LPN **GUIDRY**.

21.     The 6:27 a.m. September 18, 2018 "Chart Note" of defendant LPN **SHERMAN** states: "Nurse on duty advised by Lt. Jones inmate told security personnel that he wanted to kill himself inmate placed on suicide watch per protocol."

## THE DELIBERATE INDIFFERENCE OF THE HEALTH CARE
## PROVIDERS CORRECTHEALTH LAFOURCHE, JENNINGS,
## PATRICK, GUIDRY, EVERY, SHERMAN, ARMOND, NOLAND AND MORRIS

22.     The "Custom Flow Chart" in the CorrectHealth Lafourche record reflects monitoring by defendants LCSW **JENNINGS**, NP **PATRICK** and LPNs **PATRICK, GUIDRY, EVERY, SHERMAN, ARMOND, NOLAN** and **MORRIS** from September 18 through 12:14 p.m. on October 2, 2018, the day the defendant **JENNINGS** transferred him off of suicide watch.

23.     According to the "Subjective Interview Form" portion of the CorrectHealth Lafourche record, on September 25, 2018 at 8:03 a.m., seven (7) days later, Williams was finally interviewed about his suicidal ideations. Williams told either defendant LPN **ARMOND** or defendant LCSW **JENNINGS** the following:

> IM said he is on suicide watch because he told the deputy he wanted to kill himself because that was how he was feeling like that at the time. Said he still feels the same. He verbalized SI. Said he feels a little depressed- no appetite, not sleeping, concentration ok, feels hopeless, rumination of negative. He denied past suicide attempts. He reporting having a MH history of BP and Schiz. Taking Invega and 2 other different meds a few days. Said he goes to JPHSA in Marrero and gets his meds there also. He denied usage of drugs. Arrested for 'aggravated flight'. Hx- 'minor, misdemeanor charges'. Has HS diploma. Landscaping work. OTBI. He said he hears voices that tell him to hurt himself and others sometimes. Denied V/H. Denied HI.

24.     The CorrectHealth Lafourche record is unclear as to who interviewed Williams at this time. **ARMOND** is identified as the Interviewer, however **JENNINGS'** name also appears in the "Item Response" portion for that date.

25.     The "Mental Health SOAPE Note" of either **ARMOND** or **JENNINGS** of September 25, 2018 was to "continue on suicide watch, verify meds, psych appointment upon verification".

26.     According to the CorrectHealth Lafourche records, one of the defendants employed by **CORRECTHEALTH LAFOURCHE** had Williams execute an "Authorization for Release of

Medical Records" to JeffCare with Jefferson Parish Human Services Authority (JPHSA) on September 25, 2018. The JPHSA records were received by **CORRECTHEALTH LAFOURCHE** on the same day and scanned/saved at 8:35 a.m. by defendant **NOLAN**. Those records reflect Williams' diagnosis of schizophrenia and bipolar disorder and his treatment at JeffCare in January 2018. His medications were Oxcarbazepine 300mg 2 times per day (a mood stabilizer); Invega Sustenna 156mg/ml syringe 1mg intramuscular route 1 time per month (for schizophrenia and schizoaffective disorder) and Trazodone 5mg 1 time per day (for depression). The JeffCare records reflect Williams had treated at JeffCare since September of 2017. Even after obtaining these records the **CORRECTHEALTH LAFOURCHE** defendants failed to treat Williams with medications or refer him to a psychiatrist.

27.    Two (2) days later, on September 27, 2018 at 12:33 p.m., the defendant NP **PATRICK** recorded the following note in the "Subjective Interview Form" portion of the CorrectHealth Lafourche record:

> 36 y/o bm on suicide watch for the past 3 days. He states he is separated. States I told a guard I wanted to kill myself. He reports h/o bipolar and schizophrena, was diagnosed a few months ago. He denies hospitalizations and suicide attempts. He states he is not taking medication. He denies illicit drug use, reports alcohol use. He reports depression and si/hi thoughts. He denies plan.

**PATRICK's** note was in error as Williams had been on suicide watch 9 days, not 3.

28.    **PATRICK's** "Mental Health SOAPE Note" following that meeting with Williams was "keep on suicide watch obtain records from Jeff Carrol rtc 1 week".

29.    Five (5) days later, on October 2, 2018 at 8:46 a.m., Williams was examined by defendant LCSW **JENNINGS** who recorded the following in the "Subjective Interview Form" portion of the CorrectHealth Lafourche record:

> IM said he is feeling 'good'. He denied SI. He denied past attempts at suicide. IM said he was getting Invega shot from JeffCare on WB up till a couple months ago. IM denied SA hx. He denied HI, AV/H. He verbalized having a hx of BP and Schiz. He verbalized having support from family and hope for his future. He was definitive in his denial of SI or wanting to hurt himself.

30.    **JENNINGS'** "Mental Health SOAPE Note" and "Provider Order" of the same date state: "Discontinue suicide watch, house per security, verify meds, psych appointment, f/u in one week by social worker".

31.    On October 2, 2018, pursuant to **JENNINGS'** Order, Williams was taken off of suicide watch and placed on D Block. On October 5, 2018 because of an alleged problem with another inmate he was moved to E Block.

32.    The October 5, 2018, 2:18 p.m. note in the "Exam Forms" portion of the CorrectHealth Lafourche **r**ecord reflects defendant LPN **NOLAN** identified Williams' "current medical/psychiatric problems" as suicidal ideations. Her note further states:

> Appointment with Appt: MenHlth SickCall-Prov for 10-09-2018: f/u social worker in one week Appointment with Appt: Mental Health Provider (NP_PA) for 10-11-2018: VERIFY MEDS. PSYCH APPOINTMENT UPON VERIFICATION.

The note does not reflect that **NOLAN** actually counsel, examined or spoke to Williams or that she reported his current suicidal ideation.

33.    Although Williams advised all the **CORRECTHEALTH LAFOURCHE** defendant employees that he had been receiving medications for his schizophrenia and bipolar disorder, and the JPSHA records verified as much, he was never prescribed any medications by the **CORRECTHEALTH LAFOURCHE** defendants or examined by a psychiatrist.

34.    On October 7, 2018, nineteen (19) days after he first threatened suicide, Williams hung himself in his cell in E Block. He was never medicated or examined by a physician, psychiatrist or psychologist. His medical care included fourteen (14) days of suicide watch, one (1) visit with

10

a nurse practitioner and one (1) or possibly two (2) visits with a LCSW. He was last seen alive at 12:36 a.m. His body was found at 4:30 a.m.

35.    Although Williams' previous medical record was obtained by **CORRECTHEALTH LAFOURCHE** from JPHSA on September 25, 2018, no defendant apparently reviewed them to verify his medications. As previously noted, Williams advised defendants **ARMOND** and/or **JENNINGS** on September 25, 2018 he had been "getting an Invega shot from JeffCare on WB up till a couple months ago." Invega is used to treat schizophrenia and mood disorder symptoms. This information was therefore available for all the defendants to see.

36.    Upon information and belief, the defendant **CORRECTHEALTH LAFOURCHE** is the employer of **JENNINGS, PATRICK, GUIDRY, MORRIS, EVERY, SHERMAN, ARMOND** and **NOLAN**, the individually named defendant health care providers. All these defendants were responsible for the care of Williams.

37.    Upon information and belief, Sheriff **WEBRE's** has a policy of requiring inmates suspected of suicide ideation to be immediately screened by on-duty medical personnel and referred for a psychiatric evaluation after necessary interventions. Defendants, **CORRECTHEALTH LAFOURCHE, JENNINGS, PATRICK, GUIDRY, MORRIS, EVERY, SHERMAN, ARMOND** and **NOLAN**, failed to follow this policy. In the alternative, **WEBRE** had no such policy.

38.    The failures on the part of **CORRECTHEALTH LAFOURCHE, JENNINGS, PATRICK, GUIDRY, MORRIS, EVERY, SHERMAN, ARMOND** and **NOLAN**, to provide Mr. Williams with appropriate medical care reached a level of deliberate indifference which deliberate indifference includes the following:

11

(1)  The failure of the above-named defendants to refer Williams to the emergency room, a physician, psychiatrist and/or psychologist during his incarceration at LPDC after he presented with suicidal ideation on September 18, 2018 at 6:27 a.m. and/or after receiving his medical records from JPHSA on September 25, 2018;

(2)  The decision of defendant LCSW **JENNINGS** to take Williams off of suicide watch on October 2, 2018 at 8:46 a.m. given the following:

>   (a)   Williams' previous intentional misrepresentation at Intake Screening on September 15, 2018 that he had no history of mental health issues;
>
>   (b)   NP **PATRICK's** previous order to keep him on suicide watch; and
>
>   (c)   His ignorance of the content of the JPHSA records.

(3)  The failure of the above-named defendants to read the JPHSA records of Williams which were made available to **CORRECTHEALTH LAFOURCHE** on September 25, 2018 at 8:35 a.m. and which reflected a history of schizophrenia and bipolar disorder for which Williams was receiving Invega Sustenna, Oxcarbazepine and Trazadone;

(4)  In the alternative, the failure of the above-named defendants to obtain the JPHSA records from JeffCare after they learned from Williams that he had a history of schizophrenia and bipolar disorder and was being treated at JeffCare where he was receiving medications;

(5)  Conducting only two (2) mental health examinations of Williams between September 18, 2018, the date he expressed suicidal ideations, and October 7, 2018, the date of his suicide, given his misrepresentations at

intake, suicidal ideation, mental health history and history of meds. (This is based on the assumption he was only seen by NP **PATRICK** on September 27th and LCSW **JENNINGS** on October 2, 2018);

(6)   In the alternative, conducting only three (3) mental health examinations of Williams between September 18, 2018, the date he expressed suicidal ideations, and October 7, 2018, the date of his suicide, given misrepresentations at intake, suicidal ideation, mental health history and history of meds. (This is based on the assumption he was only seen by LCSW **JENNINGS** on September 25 and October 2, 2018, and NP **PATRICK** on September 27, 2018);

(7)   The failure of the defendant **CORRECTHEALTH LAFOURCHE** to have a policy or protocol in place for monitoring inmates after they have been removed from suicide watch;

(8)   The failure of the defendant **CORRECTHEALTH LAFOURCHE** to instruct the LPSO to place Williams on regular monitoring (observation) or in a two-person cell given his mental health history;

(9)   The failure of **CORRECTHEALTH** and the other above-named health care defendants to follow protocols set out in the NCCHC Standards of Health Services in Jails 2018 and Standards for Mental Health Services in Correctional Facilities 2015 and 2018 Standards for Health Services in Jails;

(10) Given the severity of Williams' condition, failing to place him on the medications he had previously been prescribed at JPHSA;

(11)   Failure to prescribe appropriate medications;

13

(12)  Failing to closely monitor Williams after he was removed from suicide

watch given his earlier suicidal ideation and his mental health history; and

(13)  In addition to the aforedescribed failures, the Correcthealth Lafourche

record in this case reflects a systemic failure by the defendants and by

**CORRECTHEALTH LAFOURCHE** to have in place safeguards to insure

that the mental health experts, ie., NP **PATRICK** and LCSW **JENNINGS**,

were aware of the content of the JPHSA records, specifically Williams' prior

mental health diagnosis and medications. The record reflects that none of the

**CORRECTHEALTH LAFOURCHE** defendants knew what meds

Williams needed. In fact, the records suggest that the medications were never

verified nor was his prior mental health treatment.

39.    In   addition   to   the   aforedescribed   deliberate   indifference   the   defendant

**CORRECTHEALTH LAFOURCHE** had a policy of failing to adequately monitor, train and

supervise all its employees and, in particular, LCSW **JENNINGS**, to review outside mental health

records, to discuss between themselves patient care, or to have in place a system to monitor on a

daily basis inmates expressing suicidal ideation or inmates recently removed from suicide watch.

40.    This absence of these policies reflects defendant **CORRECTHEALTH LAFOURCHE's**

deliberate indifference to the medical care and needs of the inmates under their care and as a direct

result thereof has recently led to the self-harm or suicide of multiple inmates under its care.

Specific examples of these failed policies include the following:

A.  In June of 2016 defendant LCSW **JENNINGS** was an employee of

CorrectHealth Jefferson LLC, a subsidiary of CorrectHealth LLC, and was

responsible for treating inmates with mental health issues at the Jefferson

Parish Correctional Center (JPCC). On June 16, 2016 he examined inmate R.F. who had previously attempted to gouge out his own eyes. The inmate's previous medical records available to **JENNINGS** mandated that he be kept on Invega Sustenna. **JENNINGS** ordered the inmate to be placed on suicide watch but failed in multiple ways to comply with any of the mandated orders which included medicating the inmate with Invega Sustenna. As a result, the inmate subsequently gouged his eye.

B.   In August of 2017 defendant LCSW **JENNINGS** was an employee of CorrectHealth Jefferson LLC, a subsidiary of CorrectHealth LLC, and was responsible for treating inmates with mental health issues at the JPCC. There he treated inmate J.B. who was expressing suicidal ideations. Nonetheless, **JENNINGS** cleared J.B. from suicide watch. Two days after coming off of suicide watch J.B. hung himself at the JPCC.

C.   In September of 2018 defendant LCSW **JENNINGS** was an employee of CorrectHealth Jefferson LLC, a subsidiary of CorrectHealth LLC, and was responsible for treating inmates with mental health issues at the JPCC. There he treated inmate J.E. an inmate with a known history of mental illness as well as a history of serious suicide attempts. J.E.'s criminal defense attorneys were concerned that he was suicidal and reported it to the JPCC deputies. This was reported to **JENNINGS**. J.E. saw **JENNINGS** on September 1, 2018 and **JENNINGS** scored his suicide risk as low. Nonetheless, he was placed on suicide watch. Subsequently, on September 6, 2018 defendant

**JENNINGS** removed J.E. from suicide watch noting J.E. had no intentions

of harming himself. Twenty-one days later J.E. hung himself at the JPCC.

41.     Although CorrectHealth Jefferson LLC is a different legal entity than the defendant **CORRECTHEALTH LAFOURCHE,** upon information and belief, defendant LCSW **JENNINGS** was working for both entities in 2017 and 2018 and both were aware of **JENNINGS**' involvement in the eye gouging case and the two suicides out of JPCC.

42.     Upon information and belief, the **CORRECTHEALTH LAFOURCHE** and CorrectHealth Jefferson LLC policies on monitoring, training and supervision of employees, including defendant LCSW **JENNINGS** as relates to suicidal prisoners are identical to one another and identical to the policies of the parent LLC, CorrectHealth, LLC.

43.     In addition, **CORRECTHEALTH LAFOURCHE** failed to staff the LPDC with a sufficient number of mental health care providers. The CorrectHealth records reflect that there were no psychiatrists employed by **CORRECTHEALTH LAFOURCHE** available to examine Williams for the nineteen (19) days following his reported suicidal ideation. Even during the fourteen (14) days Williams was on suicide watch he was only seen 1 time by a nurse practitioner and 1 or 2 times by a social worker. This reflects a policy of insufficient staffing of qualified mental heath care providers. It also permitted a non-qualified defendant, LCSW **JENNINGS**, to remove Williams from suicide watch without consulting with others. This policy of allowing a social worker and not a psychiatrist to remove a suicidal prisoner from suicide watch reflects deliberate indifference on the part of **CORRECTHEALTH LAFOURCHE**.

44.     In in 2017, in Chatham County, Georgia, where the municipal authority engaged in active contractual oversight, auditing and monitoring, authorities found that CorrectHealth, LLC subsidiary's "lack of clear policy and procedure is increasing the likelihood of an adverse event.'

… it was clear to the independent monitors from discussions with staff that consistent policies and procedures were lacking when it came to mental health." This time period was also marked by three deaths by suicide and a medical death over the course of thirteen months. Partially in response to these deaths, the municipal authority sought to end and renegotiate their contract with that CorrectHealth LLC entity.

45.     All of these failures and omissions combined suggest a lack of appropriate self-critical analysis in the critical incident review process that further jeopardized prisoner safety.

46.     At all times mentioned, herein the defendants **JENNINGS, PATRICK, GUIDRY, MORRIS, EVERY, SHERMAN, ARMOND** and **NOLAN** were employed by the defendant **CORRECTHEALTH,** and were acting in the course and scope of their employment with said defendant.

**LAFOURCHE PARISH AND SHERIFF WEBRE ACTED WITH
DELIBERATE INDIFFERENCE WHEN THEY FAILED
TO CONTRACT FOR ADEQUATE MENTAL HEALTH CARE
AND FAILED TO ACCOMMODATE SAMUEL WILLIAMS' DISABILITY**

47.     **LAFOURCHE PARISH** has an obligation under Louisiana state law to fund constitutionally adequate medical and mental health care at LPDC. **LAFOURCHE PARISH** contracted with **CORRECTHEALTH LAFOURCHE** to provide medical and mental health care for people housed at the LPDC.

48.     Prior to Williams' death **LAFOURCHE PARISH** knew or should have known that CorrectHealth LLC subsidiaries were not providing constitutionally adequate care. Serious harm or death has come to other CorrectHealth LLC patients in need of medical and mental health care at the Jefferson Parish Correctional Center, a client of CorrectHealth Jefferson, LLC, evincing unconstitutional medical and mental health care:

a. On March 27, 2016, JPSO deputies used excessive force on Danielle Nailer, a prisoner with a mental disability, and broke her arm. CorrectHealth Jefferson, LLC physicians and employees documented the need to x-ray Danielle Nailer's arm to formally diagnose the fracture, but never performed the x-ray or provided her with any medical care for her broken arm. Ms. Nailer did not receive any care for her broken arm until she left the care of CorrectHealth Jefferson, LLC and JPCC four days later on March 31, 2016. The failure to provide an x-ray or other treatment for Ms. Nailer's broken arm was driven by improper budgetary movtives.

b. In 2016, CorrectHealth Jefferson, LLC doctors failed to provide legally mandated medications prescribed to a psychotic patient who had been stabilized and restored to competency at the state forensic hospital. No psychiatrist saw the patient for nearly two months while the patient reported command hallucinations and attempted to gauge his eyes out multiple times.

c. Jerome Bell hanged himself on August 4, 2017 when he was placed in a single cell out of deputy sight lines despite significant risk factors for suicide. He was not seen by a psychiatrist.

d. Joshua Belcher hanged himself on August 17, 2017, three days after he was cleared from suicide watch and four days after he attempted to hang himself. He was not seen by a psychiatrist on suicide watch or after he was removed from watch.

49. **LAFOURCHE PARISH** should have known about these previous instances of serious harm befalling prisoners with mental illness. Upon information and belief, the contract between

**LAFOURCHE PARISH** and **CORRECTHEALTH LAFOURCHE** contained provisions regarding information **CORRECTHEALTH LAFOURCHE** must report to **LAFOURCHE PARISH** and **WEBRE,** which upon information and belief, included: (1) maintaining a quality assurance program for the medical program; (2) developing a system for routine medical records audit and monthly reports for **LAFOURCHE PARISH**; (3) immediately notify the Parish Attorney's Office and other responsible parties in the event **CORRECTHEALTH LAFOURCHE** receives notice of a legal action against it or the parish arising out of or relating to the medical services, subject of their Agreement; …; and (4) submitting monthly reports of all activities conducted pursuant to the contract, including but not limited to, the number and types of screenings, number and types of examinations, number of prescriptions, transports, and admission into other health care facilities, as well as any changes in personnel.

50.    **LAFOURCHE PARISH** also knew or should have known that its contract with **CORRECTHEALTH LAFOURCHE** constrained **CORRECTHEALTH LAFOURCHE's** development and implementation of its Medical Program to the budget approved by the Lafourche Parish Council. Upon information and belief, by the terms of the contract on its face, **LAFOURCHE PARISH** sublimated any other requirements for constitutionally adequate medical and mental health care to its budgetary constraints. **LAFOURCHE PARISH** knew or should have known that mental health care at LPDC was unconstitutional and that the budgetary restraints included in the contract were a contributing factor.

51.    The contract also allows for the termination of the contract for the failure to provide satisfactory quality of work or convenience.

52.    Under the terms of the contract, **LAFOURCHE PARISH** had the option to terminate the contract with **CORRECTHEALTH LAFOURCHE** or send a notice to cure any failure at any

time. **LAFOURCHE PARISH** did not terminate the contract, or send a notice to cure or examine its budget provisions although it knew, must have known, or should have known that **CORRECTHEALTH LAFOURCHE** was not providing constitutionally adequate mental health care.

53.    Defendants **LAFOURCHE PARISH** and Sheriff **WEBRE** and his employees, Capt. **DAVIS** and Major **GRANIERE**, failed to monitor the contract with **CORRECTHEALTH LAFOURCHE** to ensure that constitutionally adequate care was being provided to prisoners in the custody of the LPDC.

### THE DELIBERATE INDIFFERENCE OF THE DEFENDANTS - <br> WEBRE, DAVIS, GRANIERE, DENISON, WALDROP AND MARCELLO

54.    Upon information and belief, defendants, **WEBRE, DAVIS** and **GRANIERE**, in their official capacities developed a policy requiring regular security checks of the inmates incarcerated at the LPDC. Williams was housed in E Block. At approximately 12:36 a.m. on October 7, 2018 he was observed in the E Block dayroom by defendant **MARCELLO**. **MARCELLO** had been assigned the duty of completing regular security checks on Blocks D, E, F and G for that shift. Defendant **MARCELLO** failed to conduct any security checks of E Block after 12:36 a.m. and prior to Williams' body being discovered four (4) hours later at 4:35 a.m.

55.    In the alternative, defendant Deputy **WALDROP** was assigned the duty of completing regular security checks of cell Block E on October 7, 2018 yet he failed to do so.

56.    Had either defendant **MARCELLO** or **WALDROP** performed their security check duties as required Williams' suicide would have been prevented.

57.    The defendant Shift Supervisor Lt. **DENISON** was on duty on October 7, 2018 and supervised the defendants **MARCELLO** and **WALDROP**. **DENISON** was responsible for

ensuring that regular security checks took place on cell Block E. **DENISON** failed to enforce the LPDC regular security check policy or to personally conduct the required security check of cell Block E.

58.    The defendants **DENISON, MARCELLO** and **WALDROP** were all personally aware of the fact that Williams had previously been on suicide watch and were therefore aware that Williams had a history of suicidal ideation. Despite knowing of Williams' previous suicidal ideation these defendants failed to conduct the required security checks and permitted Williams to go unobserved for approximately four (4) hours.

59.    As a consequence of the above described failures, the defendants **DENISON, MARCELLO** and **WALDROP** knew that if Williams attempted suicide, they would be unable to prevent it.

60.    In the alternative, the defendant policymakers at LPDC **WEBRE, DAVIS** and **GRANIERE** had a policy requiring regular security checks of inmates to ensure inmate safety, however, they failed to train LPSO employees to perform the security checks or to enforce said policy, and were therefore objectively aware that the policy was not being followed.

61.    In the alternative, the defendant policymakers at the LPDC, Sheriff **WEBRE,** Capt. **DAVIS** and Major **GRANIERE**, failed to put into place a policy of regular security checks at LPDC. Regular security checks are necessary to protect the inmates from harm.

62.    As a consequence, the defendants **WEBRE, DAVIS** and **GRANIERE** knew or should have known that their lack of a policy on security checks, or their failure to train on or enforce a policy of security checks, would lead to a failure to prevent avoidable suicides such as occurred with Williams.

63.    At all times relevant to this complaint the defendants acted under color of state law.

64.    At all times mentioned herein, the defendants **DAVIS, GRANIERE, DENISON, WALDROP** and **MARCELLO** were employed by the defendant, Sheriff **WEBRE**, and were acting in the course and scope of their employment with said defendant.

65.    All of the defendants are liable to the plaintiff for compensatory and punitive damages.

66.    All the defendants are liable, jointly, severally, and *in solido* for the plaintiff's injuries.

67.    The defendants' actions were willful, wanton and reckless and constitute a radical and substantial departure from accepted professional judgement, practice, and standards.  Their actions consequently violated Mr. Williams' constitutional rights as a pre-trial detainee in the care of the defendants.  The defendants' actions were the proximate cause of the injuries and the damages sustained by plaintiff.

68.    Defendants, individually and collectively, had the duty and ability to intervene to prevent the violations of the rights of the plaintiff described herein, but failed to do so.

## IV.  CAUSES OF ACTION

### COUNT 1:

### §1983 Violation Based on Establishment of a System in which Prisoners are Denied Appropriate Protection from Harm – Defendants WEBRE, DAVIS, GRANIERE and LAFOURCHE PARISH GOVERNMENT (Official Capacities)

69.    Plaintiff repeats and re-alleges each and every allegation of the complaint.

70.    The defendants named in this Count, acting individually and together, under color of law, acted to violated Mr. Williams' rights to due process, equal protection of the laws, and the right to be free from cruel and unusual punishment as protected by the Eighth and Fourteenth Amendments of the United States Constitution and 42 USC §1983.  They did so by establishing and maintaining a system that they knew would result in a lack of appropriate supervision of patients effectively

denying protection and demonstrating deliberate indifference to patients at risk of harming themselves.

71.     Defendants further did so by contracting with **CORRECTHEALTH LAFOURCHE** for inadequate and insufficient services for medical and mental health care that they knew would result in deliberate indifference to prisoners with serious medical conditions through deprivation of adequate medical and mental health care for prisoners with serious mental health disorders and those with suicidal thoughts.

72.     The plaintiff was specifically and individually harmed by this system because it resulted in the death of her father, which could have been prevented with appropriate patient monitoring and supervision.

73.     At all pertinent times, the defendants named in this Count, individually and collectively, acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety, constitutional and civil rights of plaintiff by failing to provide appropriate medical and mental health services. Alternatively, defendants named in this count substantially departed from accepted professional judgement, practice, and standards, thereby violating Mr. Williams' constitutional and civil rights as a pre-trail detainee in the care of the defendants by establishing the above-described system.


### COUNT 2:

### §1983 Violation Based on Failure to Supervise other Defendants to Ensure Patients Received Appropriate Care and Supervision to Protect Patients from Harm – Defendants WEBRE, DAVIS, GRANIERE, CORRECTHEALTH LAFOURCHE (Individual and Official Capacities)

74.     The defendants named in this Count, in their individual and official capacities, failed to supervise their employees and subordinates to ensure that these subordinates did not act with

deliberate indifference by ignoring prisoners' acute mental status changes, requests for medical and / or mental health treatment, failing to refer prisoners needing treatment to appropriate mental health professionals, and / or failing to properly monitor prisoners who report suicidal ideation or show signs of mental health crisis. The plaintiff was directly harmed by this failure to supervise because it caused the death of her father, Samuel Williams, who was left untreated or received patently insufficient treatment and supervision. At all pertinent times herein, defendants **WEBRE, DAVIS, GRANIERE** and **CORRECTHEALTH LAFOURCHE** were aware of the need to supervise their subordinates and employees in order to ensure that they did not violate prisoners' rights.  These defendants ignored that need and acted unreasonably and with deliberate indifference and disregard for the safety of plaintiff's father, Samuel Williams, as described above.

75.     Defendants     Sheriff     **WEBRE,**     Capt.     **DAVIS**     Major     **GRANIERE**     and **CORRECTHEALTH LAFOURCHE** failed to train and supervise their subordinates, namely defendants Lt**. DENISON**, Deputies **WALDROP** and **MARCELLO,** LCSW **JENNINGS**, NP **PATRICK**, and LPNs **GUIDRY, MORRIS, EVERY, SHERMAN**, **ARMOND** and **NOLAN**, to ensure that these subordinates did not act with deliberate indifference by ignoring inmates' requests and needs for medical and/ or mental health treatment, and / or failing to refer inmates needing treatment to appropriate mental health professionals. They failed to ensure that their subordinates provided reasonable and sufficient treatment for inmates' conditions and properly monitored prisoners who were being treated. The plaintiff was directly harmed by this failure to supervise because these failures caused the death of her father who was either left untreated or received patently insufficient treatment for his serious medical needs from the specified defendants. They failed to ensure that their subordinates followed LPDC policy in regards regular

24

security checks or failed to train or supervise employees concerning said policy and/or failed to put in place a policy or regular security checks of inmates knowing and/or constructively knowing that their failure in this regard would result in harm to prisoners.

76.    At all pertinent times herein, the defendants named in this Count were aware of the need to supervise their subordinates in order to ensure that they did not violate patients' rights, ignored that need and acted unreasonably and with deliberate indifference, thereby violating Samuel Williams' constitutional rights.

### COUNT 3:

### §1983 Violation Based on Deliberate Indifference to Samuel Williams' Constitutional Right to Protection From Harm - WEBRE, DAVIS, GRANIERE, CORRECTHEALTH LAFOURCHE, LT. DENISON, DEPUTIES WALDROP, MARCELLO, LCSW JENNINGS, NP PATRICK, and LPNs GUIDRY, MORRIS, EVERY, SHERMAN, ARMOND and NOLAN

77.    The above-named defendants, acting individually and together, and under color of law, engaged in a course of conduct and conspired to engage in a course of conduct that acted to deprive Samuel Williams of his constitutional rights and did deprive him of said rights, specifically, the right to reasonable and adequate protection from harm, the right to be free from cruel and unusual punishment, and the right to due process and equal protection of the laws as protected by the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

78.    At all times pertinent herein, these defendants, acting individually and collectively, acted unreasonably, recklessly, maliciously, and with deliberate indifference to the medical needs and serious risk of harm from suicide to Samuel Williams thereby violating his constitutional and civil rights. Furthermore, these defendants, individually and collectively, had the duty and ability to intervene to prevent the violations of the rights of Samuel Williams, as described herein, but failed to do so.

79.     Defendant **CORRECTHEALTH LAFOURCHE** is liable both directly and under the doctrine of *respondeat superior* for the constitutional torts of its employees.

## COUNT 4:

### Violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act by Discriminating Against and Failing to Accommodate a Disability – SHERIFF WEBRE AND LAFOURCHE  PARISH (Official Capacities)

80.     Samuel Williams was a person with a disability under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act (ADA). He suffered from mental illness, namely, schizophrenia and bipolar disorder. He had a history of having been diagnosed with that disability and was regarded as having it.

81.     Sheriff **WEBRE** as the representative of the LPSO, and **LAFOURCH PARISH** are both public entities which must comply with Section 504 and the Americans with Disabilities Act.

82.     Plaintiff is entitled to relief against this defendant as Sheriff **WEBRE** as the representative of the LPSO and **LAFOURCHE PARISH** had notice of Mr. Williams' disability, had means to accommodate his disability, and failed to make that reasonable accommodation, as described in this Complaint.

83.     Section 504 of the Rehabilitation Act requires recipients of federal funds, including defendants Sheriff **WEBRE** and **LAFOURCHE PARISH**, to reasonably accommodate persons with disabilities in their facilities, program activities, and services.  Section 504 further requires such recipients modify such facilities, services, and programs as necessary to accomplish this purpose. Defendants Sheriff **WEBRE** and **LAFOURCHE PARISH**, which employed the other defendants in this Count, have been and currently are the recipients of federal funds.

84.     The ADA and Rehabilitation Acts define discrimination as the failure to take necessary steps to ensure that any individual with a disability is excluded, denied services, segregated, or

otherwise treated differently than other individuals because of the absence of services for the disabled. Such services include, inter alia, provisions necessary to achieve effective mental health care and to protect a person from the risk of death from non-treatment of serious medical conditions.

85.     Instead of accommodating Samuel Williams' mental disability, Sheriff **WEBRE** and **LAFOURCHE PARISH** denied Williams physical accommodation, services and programs available to others, including but not limited to access to safe physical accommodation, supervision and treatment that if timely provided could have prevented or reduced the risk of suicide. The failure to respond to Williams' decompensating mental state was based on a failure to listen to and provide the appropriate follow up care to an individual with mental illness reporting significant symptoms of emotional distress.  It was also based on the failure to provide appropriate supervision and to mitigate risks associated with physical structures inside the cell housing Williams that created a known suicide risk. This failure to accommodate Williams' disability was a proximate cause of his death.

86.     Further, **LAFOURCHE PARISH** and Sheriff **WEBRE** had notice of Samuel Williams' disability and were aware that the LPSO and **CORRECTHEALTH LAFOURCHE** would fail to provide adequate modification and accommodation.

### COUNT 5:

**Monell Violation of §1983 Based on Establishment of Policies,
Patterns or Practices pursuant to which Inmates with Serious Mental
Health Conditions are Denied Access to Appropriate Medical Care and
Prevention from Harm – Defendants SHERIFF WEBRE, CAPT. DAVIS,
MAJOR GRANIERE, CORRECTHEALTH LAFOURCHE (Official Capacities)**

87.     The defendants named in this Count, **WEBRE, DAVIS, GRANIERE** and **CORRECTHEALTH LAFOURCHE** acting individually and together, under color of law, acted

to violate Samuel Williams' rights to be free from cruel and unusual punishment and the right to due process and equal protection of the laws as protected by the Fourteenth Amendment of the United States Constitution and 42 USC §1983. They did so by establishing and maintaining policies, patterns or practices that they knew would deprive prisoners with serious medical conditions, namely serious mental health disorders, of treatment for those disorders.

88. These policies and practices specifically included **CORRECTHEALTH LAFOURCHE's** practice of failing to provide a qualified mental health staff, failing to provide a sufficient number of qualified mental health providers, failing to ensure that psychiatrists cleared patients off of suicide watch, failing to properly supervise and train its employees, failing to provide supportive therapy and interaction to patients on suicide watch, failing to provide appropriate suicide step-down and follow up plans, failing to have a policy in place to monitor its staff to ensure quality control and ensure prior health care records are shared and read on a daily basis to ensure that the staff knows a patient's prior mental health history and medication needs.

89. These policies and practices also specifically included defendant **WEBRE's, DAVIS'** and **GRANIERE's** practice of failing to have in place a policy of security checks of inmates, failing to have in place a step down policy for increased monitoring of inmates coming off suicide watch, having a security check policy in place but having a policy of not training, supervising on monitoring the deputies to confirm they are conducting security checks; having a policy of ignoring CorrectHealth LLC's history of deliberate indifference to the mental health needs of prisoners in other jurisdictions, knowing full well that **CORRECTHEALTH LAFOURCHE** followed the same policies and procedures, and employed the same employees at **CORRECTHEALTH LAFOURCHE** responsible for deliberate indifference elsewhere.

90.    The plaintiff was individually harmed by these policies and practices because these policies, patterns, and practices resulted in the death of her father, Samuel Williams as described above.

91.    At all pertinent times, the defendants named in this Count, individually and collectively, acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety, constitutional, and civil rights of Samuel Williams and the plaintiffs by establishing the above-described policies, patterns and practices.

92.    The above-named defendants are therefore liable to the plaintiff for the violation of constitutional rights described above pursuant to *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

## COUNT 6:

### Medical Malpractice of Defendants CORRECTHEALTH LAFOURCHE, LCSW JENNINGS, NP PATRICK, LPNs GUIDRY, MORRIS, EVERY, SHERMAN, ARMOND and NOLAN

93.    The above-described actions and inactions of defendants **CORRECTHEALTH LAFOURCHE, JENNINGS, PATRICK, GUIDRY, MORRIS, EVERY, SHERMAN, ARMOND** and **NOLAN**, who were healthcare professionals charged with the care of Samuel Williams fell beneath the applicable standard of care for such professionals and resulted in Mr. Williams' death.  These defendants are therefore liable to the plaintiff for their negligence.

## COUNT 7:

### Negligent and / or Intentional Conduct Resulting in Injury – All Defendants

94.    State law Torts.  The above-named defendants, acting individually and together, and under color of law, engaged in a course of conduct and conspired to engage in a course of negligent

and/or intentional conduct that caused injury and harm to Mr. Williams and ultimately lead to his death. The conduct included negligent policies and practices, negligent retention of unqualified employees, negligent supervision, training and monitoring of employees by supervisors, negligent care of Mr. Williams by individual defendants and all other negligence previously described in paragraphs 19-68 of the Complaint. At all times pertinent herein, these defendants, individually and collectively, acted intentionally, maliciously, recklessly, and/or negligently towards Mr. Williams. Furthermore, these defendants, individually and collectively, had the duty and ability to intervene to prevent the tortious conduct of co-defendants toward Mr. Williams, as described herein, but failed to do so. They are therefore liable to the plaintiff, as described herein. Additionally, the individual defendants' respective employers, **WEBRE** and **CORRECTHEALTH LAFOURCHE** are liable for the defendants' actions on the basis of *respondeat superior*, as all defendants' actions were undertaken within the course and scope of their employment with **WEBRE** and **CORRECTHEALTH LAFOURCHE**, respectively.

## V. <u>DAMAGES</u>

95.    As a result of the above-described civil rights violations damages have been incurred as follows:

      a.    Samuel Williams (deceased) suffered conscious and severe physical, mental and emotional distress, pay and suffering prior to his death and lost his life.

      b.    **S.W.** the daughter of Samuel Williams, suffered emotional pain and suffering, past, present, and future; loss of support; and has suffered the loss of love, affections, and companionship of her father.

96.    The plaintiff is entitled to punitive damages as a result of the wanton conduct of the named defendants.

97.    The plaintiff is entitled to reasonable attorney's fees as provided by 42 U.S.C. § 1988 and all costs of these proceedings and legal interest.

## IV.  PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that after due proceedings there be judgment rendered herein in plaintiff's favor and against all defendants individually and jointly, as follows:

1.    Compensatory and punitive damages as prayed for herein;

2.    Reasonable attorneys' fees, as provided in 42 U.S.C. § 1988 and 42 U.S.C. § 12205, and all costs of these proceedings and legal interest; and

3.    All other relief as appears just and proper to this Honorable Court.

Respectfully Submitted,

s/ Gary W. Bizal
GARY W. BIZAL (Bar Roll No. 1255)
GARY W. BIZAL, L.L.C.
4907 Magazine Street
New Orleans, Louisiana 70115
Tel. 504-525-1328
Fax. 504-525-1353
gary@garybizal.com

*Counsel for Plaintiff*

## SERVICE ON ALL DEFENDANTS WILL BE MADE BY WAIVERS

31