UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

DEANNA PHOENIX, *on behalf of*                    CIVIL ACTION
*her minor daughter, S.W.*

v.                                                NO. 19-13004

LAFOURCHE PARISH GOVERNMENT, ET AL.               SECTION "F"

<u>ORDER AND REASONS</u>

Before the Court is a motion to dismiss by CorrectHealth Lafource, LLC, David Jennings, Kendra Patrick, Patricia Guidry, Katasha Morris, Aysa Every, Shanta Sherman, Sara Armond, and Chelsea Nolan.  For the reasons that follow, the motion is GRANTED in part and DENIED in part.

**Background**

This civil rights lawsuit arises from a mentally ill pretrial detainee's suicide by hanging in his jail cell days after being removed from suicide watch.

Sometime between 12:37 a.m. and 4:30 a.m. on October 7, 2018, 36-year-old Samuel June Williams hanged himself in a jail cell in the E Block at the Lafourche Parish Detention Center.  Nineteen days after he told a correctional officer he was suicidal and five days after being removed from suicide watch.  This civil rights litigation on behalf of his minor daughter followed.

1

The Court takes as true the allegations in the complaint.

Samuel Williams suffered from schizophrenia and bipolar disorder. Arrested on unspecified charges, on September 15, 2018, Williams was transported to the Lafourche Parish Detention Center, which is operated and administered by Lafourche Parish Sheriff's Office. Sheriff Craig Webre is a policymaker for the LPSO and detention center; he was responsible for staffing the detention center and contracting with medical providers. Major Jeremy Graniere and Captain Cortell Davis were Corrections Directors of the LPSO; both were policymakers responsible for training and supervising staff that supervised the detainees in LPSO custody. The LPSO contracted with CorrectHealth Lafourche LLC (CHL) to provide and manage medical and mental health services for detainees in LPSO custody at LPDC; CHL provided staff, training, and policies for all medical and mental health personnel it employed at LPDC, including David Jennings (a social worker), Kendra Patrick (a nurse practitioner), and a number of licensed practical nurses, Patricia Guidry, Katasha Morris, Aysa Every, Shanta Sherman, Sarah Armond, and Chelsea Nolan.

Detainees are screened on arrival at LPDC. In the intake screening form for Williams, CHL nurse Aysa Every indicated that Williams denied thoughts of self-harm, denied mental health history, and denied a history of suicide attempts or ideation. From a holding cell, Williams was placed in F Block; the next day

2

he was transferred to G Block.  That same day, Williams informed a correctional officer that he was suicidal.[1]  By 8:05 a.m. on September 18, 2018, Williams was placed on suicide watch and watched by CHL licensed practical nurses Patricia Guidry or Shanta Sherman.

Williams remained on suicide watch from September 18 until 12:14 p.m. on October 2, 2018.  During the two-week suicide watch period, the Custom Flow Chart kept by the CHL medical providers indicates that the following individuals monitored Williams: David Jennings (social worker); Kendra Patrick (nurse practitioner); and Patricia Guidry, Aysa Every, Shanta Sherman, Sarah Armond, Chelsea Nolan, and Katasha Morris (licensed practical nurses).

Seven days after being placed on suicide watch, Williams was interviewed about his suicidal ideations; he informed either Armond or Jennings that he felt depressed and suicidal, that he had mental health history of bipolar and schizophrenia diagnoses, and that he had been prescribed medications to treat his mental illnesses.  The mental health note (taken by either Armond or Jennings) on September 25, 2018 recommends "continue on suicide watch, verify meds, psych appointment upon verification."  That same day, Williams signed a release authorizing JeffCare (of

---

[1] A Chart Note by Shanta Sherman at 6:27 a.m. on September 18, 2018 states, "Nurse on duty advised by Lt. Jones inmate told security personnel that he wanted to kill himself inmate placed on suicide watch per protocol."

Jefferson Parish Human Services Authority) to release his mental health records to LPDC; Williams had been treated at JeffCare since September 2017. Williams's JeffCare records were either received that same day, or CHL failed to obtain them.[2] The JeffCare records essentially confirmed with more specificity what Williams reported to CHL. The records indicate that Williams had been diagnosed with schizophrenia and bipolar disorder and that his treatment regimen in January 2018 at JeffCare included three medications: a mood stabilizer, to be taken twice daily; a schizoaffective/ schizophrenia medication to be taken once each month; and an anti-depressive to be taken once daily. CHL did not provide Williams with these or any medications. Nor did CHL schedule an appointment for a psychiatrist or psychologist to examine Williams.

Two days later on September 27, 2018, in the Subjective Interview Form in CHL's record, Patrick noted that Williams was on suicide watch (but erroneously noted the suicide watch time period spanned three, rather than nine, days), that Williams had reported that he was diagnosed with bipolar disorder and schizophrenia a few months ago, that Williams "states he is not taking medication," and that he reports depression and suicidal thoughts. Patrick

---

[2] It is alleged, the medical records were received by CHL and saved by Nolan It is alternatively alleged that CHL failed to obtain the records.

also noted "keep on suicide watch obtain records from Jeff Carrol rtc 1 week."

Five days later on October 2, 2018, Williams was examined by Jennings, CHL social worker, who noted in the Subjective Interview Form that Williams

> said he is feeling 'good.'  He denied [suicidal ideation].  He denied past attempts at suicide. [Williams] said he was getting Invega shot from JeffCare...up till a couple months ago....  He verbalized having support from family and hope for his future. He was definitive in his denial of [suicidal ideation] or wanting to hurt himself.

Jennings discontinued Williams's suicide watch: in a mental health note and provider order that same day, Jennings stated "Discontinue suicide watch, house per security, verify meds, psych appointment, f/u in one week by social worker."  In accordance with Jennings's order, Williams was removed from suicide watch on October 2 and placed on D Block.  After a problem with another inmate a few days later, Williams was moved to E Block.

The same day he was moved to E Block, the Exam Forms portion of the CHL record reflects that Nolan noted: "Appointment with Appt: MenHlth SickCall-Prov for 10-09-2018: f/u social worker in one week Appointment with Appt: Mental Health Provider (NP_PA) for 10-11-18: VERIFY MEDS. PSYCH APPOINTMENT UPON VERIFICATION." Whether Nolan examined or spoke to Williams, or ascertained whether he was experiencing suicidal ideation, is not reflected in the

note. "Although Williams advised all the CorrectHealth Lafourche defendant employees that he had been receiving medications for his schizophrenia and bipolar disorder, and the JPSHA records verified as much," it is alleged, Williams "was never prescribed any medications by [CHL] or examined by a psychiatrist."

Nineteen days after threatening suicide -- unmedicated and before being examined or treated by a psychiatrist or physician -- on October 7, 2018, Williams hanged himself in his cell.  He was last seen alive at 12:36 a.m.; his body was found at 4:30 a.m. His medical "treatment" at the jail consisted of being placed on suicide watch for 14 days, one visit with a nurse practitioner, and one or two visits with a social worker.

On October 7, 2019, Deanna Phoenix, on behalf of Phoenix's (and Williams's) minor daughter, S.W., sued Lafourche Parish Government, Sheriff Craig Webre (in his individual and official capacity as the Sheriff of Lafourche Parish), Major Jeremy Graniere (in his individual and official capacity as the Corrections Director of LPSO), Lieutenant Craig Denison ("in his individual capacity as Shift Supervisor at the LPSO"), Deputy Stephen Waldrop (in his individual capacity), Deputy Sal Marcello (in his individual capacity), CorrectHealth Lafourche LLC, and CHL employees David Jennings, Kendra Patrick, Patricia Guidry, Katasha Morris, Aysa Every, Shanta Sherman, Sarah Armond, and Chelsea Nolan

(each in their individual capacities).  The plaintiff dismissed her claims against Lafourche Parish.

The plaintiff alleges seven claims.  In Count 1, the plaintiff alleges 42 U.S.C. § 1983 official capacity claims against the law enforcement and corrections officer defendants, Webre, Davis, and Graniere; the plaintiff alleges due process, equal protection, and freedom from cruel and unusual punishment violations based on a system in which prisoners are denied appropriate protection from harm due to inappropriate supervision, contracting with CHL for inadequate medical health care resulting in deliberate indifference to prisoners' mental health conditions.  In Count 2, the plaintiff alleges § 1983 individual and official capacity claims, specifically based on certain defendants' (Webre, Davis, Graniere, and CHL's) failure to supervise and train other defendants to ensure patients received appropriate care and supervision to protect patients from harm; by failing to train or supervise their employees (who failed to monitor Williams or refer him for treatment), she alleges that the defendants deliberately disregarded her father's serious medical needs.  The plaintiff alleges that her father's death would have been prevented with appropriate patient monitoring and supervision.  In Count 3, the plaintiff alleges § 1983 claims for violations of Williams's right to due process, equal protection, and freedom from cruel and unusual punishment based on deliberate indifference to Williams's

7

constitutional right to protection from harm; the plaintiff names as defendants Webre, Davis, Graniere, CHL, Lt. Denison, Deputies Waldrop and Marchello, Jennings, Patrick, Guidry, Morris, Every, Sherman, Armond, and Nolan.   In Count 4, the plaintiff alleges that Sheriff Webre violated the Americans with Disabilities Act and Section 504 of the Rehabilitation Act by discriminating against and failing to accommodate Williams's disabilities of schizophrenia and bipolar disorder.   In Count 5, the plaintiff alleges a § 1983 Monell violation based on defendants Webre, Davis, Graniere, and CHL, in their official capacities, maintaining policies that denied access to appropriate medical care and prevention from harm, which the defendants knew would deprive detainees with serious mental health disorders of treatment.   In Count 6, the plaintiff alleges medical malpractice by CHL and CHL employees Jennings, Patrick, Guidry, Morris, Every, Sherman, Armond, and Nolan.   In Count 7, the plaintiff alleges state law torts of negligent or intentional conduct (including negligent retention of unqualified employees, negligent supervision and training) resulting in injury against all defendants.   The plaintiff seeks compensatory and punitive damages as well as attorney's fees and costs.   The law enforcement and corrections officer defendants answered the complaint, invoked qualified immunity, and asserted various defenses.

Focusing on the allegations directed to the health care provider defendants, the plaintiff alleges that Lafourche Parish contracted with CorrectHealth Lafourche (CHL) to provide medical and mental health care services, that constitutionally inadequate care was provided, and that CHL is liable directly and under the doctrine of *respondeat superior* for the constitutional torts of its employees. The medical care provider defendants (CHL and its employees) failed to review Williams's medical records despite receiving them on September 25, 2018 and they failed to verify, obtain, or administer Williams's medications.  Notwithstanding Sheriff Webre's policy requiring inmates suspected of suicide ideation to be screened by on-duty medical personal and referred for a psychiatric evaluation after necessary interventions, it is alleged, the medical care defendants failed to follow this policy. Alternatively, the plaintiff alleges, there was no such policy. The plaintiff also alleges that the medical provider defendants were deliberately indifferent:

- By failing to refer Williams to the emergency room, a physician, or psychiatrist after he presented with suicidal ideation on September 18 and after receiving his medical records on September 25;
- By deciding to remove Williams from suicide watch on October 2, given that Williams had previously misrepresented to Intake that he had no history of mental health issues; Patrick had ordered him to be on suicide watch; and Jennings was ignorant of the contents of Williams's mental health records;

- By failing to read the JeffCare records reflecting Williams's mental health and medication history;
- Alternatively, by failing to obtain the JeffCare records after they learned from Williams that he had been diagnosed as schizophrenic and bipolar;
- By conducting only two mental health examinations (one by Patrick and one by Jennings) between the date Williams expressed suicidal ideations and the date of his suicide;
- By failing to have a policy in place for monitoring inmates removed from suicide watch;
- By failing to instruct the LPSO to place Williams on regular monitoring (observation) or in a two-person cell given his mental health history;
- By failing to follow protocols set out in the NCCHC Standards of Health Services in Jails 2018 and Standards for Mental Health Services in Correctional Facilities 2015 and 2018 Standards for Health Services in Jails;
- By failing to place Williams on the medications he had been prescribed at JPHSA, given the severity of his condition;
- By failing to prescribe medications;
- By failing to closely monitor Williams after he was removed from suicide watch given his earlier suicidal ideation and his mental health history; and
- By failing to verify Williams's medications and prior mental health treatment and failing to have in place safeguards to ensure that the mental health experts (Patrick and Jennings) were aware of the contents of the JPHSA records.

The plaintiff also alleges that CHL was deliberately indifferent given its policy of failing to adequately monitor, train, and supervise its employees, especially Jennings, to review outside mental health records, to discuss patient care, or to create a system to monitor daily inmates expressing suicidal ideation or inmates recently removed from suicide watch. The absence of these policies, the plaintiff alleges, reflects CHL's deliberate indifference to the medical care and needs of inmates under their care and has led to self-harm or suicide of multiple inmates

10

including: (1) An inmate under Jennings's care at a different institution, JPCC, in 2016; the inmate had previously attempted to gouge out his own eyes, was placed on suicide watch but Jennings failed to prescribed a particular medication to the inmate despite prior medical records available to Jennings indicating that the inmate must be kept on the medication; as a result, the inmate gouged his eye.  (2) Another inmate under Jennings's care at JPCC, J.B., who expressed suicidal ideations; Jennings cleared him from suicide watch and, two days later, J.B. hanged himself.  (3) In September 2018, Jennings placed inmate J.E. on suicide watch at JPCC; 21 days after Jennings removed J.E. from suicide watch, J.E. hanged himself at JPCC.  Although CHL and CorrectHealth Jefferson are different entities, it is alleged that Jennings was working for both entities in 2017 and 2018, both were aware of Jennings's involvement in the self-harm and suicide cases at JPCC, and both had identical policies on monitoring, training, and supervising employees like Jennings as it relates to suicidal prisoners.  CHL failed to staff the LPDC with sufficient mental health care providers: no psychiatrists were employed there and Williams was only seen once by a nurse practitioner and twice by a social worker; this policy of inadequate staffing, which allowed Jennings to remove Williams from suicide watch without consulting with others, reflects deliberate indifference.

The medical care provider defendants (CHL and its employees) now move to dismiss the plaintiff's claims for failure to state a claim.

I.

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. Such a motion is rarely granted because it is viewed with disfavor. See Lowrey v. Tex. A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997) (quoting Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982)).

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009)(citing Fed. R. Civ. P. 8). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

In considering a Rule 12(b)(6) motion, the Court "accept[s] all well-pleaded facts as true and view[s] all facts in the light most favorable to the plaintiff." See Thompson v. City of Waco, Texas, 764 F.3d 500, 502 (5th Cir. 2014)(citing Doe ex rel. Magee

v. Covington Cnty. Sch. Dist. ex rel. Keys, 675 F.3d 849, 854 (5th
Cir. 2012)(en banc)).   But, in deciding whether dismissal is
warranted, the Court will not accept conclusory allegations in the
complaint as true.  Id. at 502-03 (citing Iqbal, 556 U.S. at 678).

        To survive dismissal, "'a complaint must contain sufficient
factual matter, accepted as true, to state a claim to relief that
is plausible on its face.'" Gonzalez v. Kay, 577 F.3d 600, 603
(5th Cir. 2009)(quoting Iqbal, 556 U.S. at 678)(internal quotation
marks omitted). "Factual allegations must be enough to raise a
right to relief above the speculative level, on the assumption
that all the allegations in the complaint are true (even if
doubtful in fact)." Twombly, 550 U.S. at 555 (citations and
footnote omitted).  "A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to draw the
reasonable inference that the defendant is liable for the
misconduct alleged." Iqbal, 556 U.S. at 678 ("The plausibility
standard is not akin to a 'probability requirement,' but it asks
for more than a sheer possibility that a defendant has acted
unlawfully."). This is a "context-specific task that requires the
reviewing court to draw on its judicial experience and common
sense." Id. at 679.  "Where a complaint pleads facts that are
merely consistent with a defendant's liability, it stops short of
the line between possibility and plausibility of entitlement to
relief." Id. at 678 (internal quotations omitted) (citing Twombly,

550 U.S. at 557). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'", thus, "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (alteration in original) (citation omitted).

Finally, "[w]hen reviewing a motion to dismiss, a district court 'must consider the complaint in its entirety, as well as other sources ordinarily examined when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Funk v. Stryker Corp., 631 F.3d 777, 783 (5th Cir. 2011)(quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)). If the Court considers materials outside of the pleadings, the motion to dismiss must be treated as a motion for summary judgment under Rule 56. See Causey v. Sewell Cadillac-Chevrolet, Inc., 394 F.3d 285, 288 (5th Cir. 2004); see also Fed. R. Civ. P. 12(d).

## II.

Only the healthcare provider defendants, CHL and its employees sued in their individual capacities, move to dismiss the plaintiff's claims at this time. The plaintiff alleges that CHL and its employees violated Williams's Eighth and Fourteenth Amendment right to medical care and protection from harm while he

was detained at Lafourche Parish Detention Center.  The plaintiff pursues a <u>Monell</u> claim against CHL and episodic-act (deliberate indifference) claims against the individual CHL employee-defendants.  In addition to the federal civil rights claims, the plaintiff also seeks to recover for intentional torts as well as medical malpractice (and, as to CHL, vicarious liability) under state law; the medical malpractice claims, which arise from the same factual predicate underlying the federal civil rights claims, have been submitted to a state medical review panel, as state law requires.

CHL and its employees move to dismiss the plaintiff's civil rights claims for failure to state a claim and move to dismiss without prejudice the medical malpractice claims pending exhaustion by the state medical panel review.  The Court summarizes the applicable federal civil rights law to determine whether the plaintiff has stated civil rights claims against the healthcare defendants before turning to address the defendants' (undisputed) contention that the state law medical malpractice claims are premature.

*A.*

Title 42, United States Code, Section 1983 creates a damages remedy for the violation of federal constitutional or statutory rights under color of state law; it provides:

15

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

"The purpose of § 1983 is to deter state actors from using their badge of authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161 (1992). Because § 1983 merely provides a remedy for designated rights, rather than creating any substantive rights, "an underlying constitutional or statutory violation is a predicate to liability." Harrington v. Harris, 118 F.3d 359, 365 (5th Cir. 1997)(citation omitted).  To establish § 1983 liability, the plaintiff must satisfy three elements:

> (1)  deprivation of a right secured by the U.S. Constitution or federal law,
> (2)  that occurred under color of state law, and
> (3)  was caused by a state actor.

Victoria W. v. Larpenter, 369 F.3d 475, 482 (5th Cir. 2004) (citation omitted).

<em>B.</em>

Navigating the § 1983 legal framework applicable to a plaintiff's allegations that custodial medical officials failed to render medical care or provide protection from harm is dictated by the nature of the complainant (convicted prisoner or pretrial

detainee?), the nature of the challenged conduct (condition-of-confinement or episodic-act-or-omission?), and the sort of defendant sued (individual official or municipality?).  In this custodial suicide case, a pretrial detainee's daughter challenges episodic acts or omissions of both individual defendants and a "municipal" defendant (the municipality's contractual medical service provider).

The Eighth Amendment's prohibition against cruel and unusual punishment is the constitutional source of liability where an official demonstrates deliberate indifference to a convicted prisoner's serious medical needs, whereas pretrial detainees whom have not yet been convicted of a crime and therefore may not be punished "look to the procedural and substantive due process guarantees of the Fourteenth Amendment to ensure provision of these same basic needs."  See Jacobs v. West Feliciana Sheriff's Dep't, 228 F.3d 388, 393 (5th Cir. 2000); see also Baughman v. Hickman, 935 F.3d 302, 306 (5th Cir. 2019)("the Fourteenth Amendment case law concerning pretrial detainees [is based] on the Supreme Court's Eighth Amendment precedent concerning prisoners."); Cadena v. El Paso County, 946 F.3d 717, 727 (5th Cir. 2020)(noting that "[t]he standard is the same as that for a prisoner under the Eighth Amendment"); Bell v. Wolfish, 441 U.S. 520, 535 (1979)(observing that pretrial detainees have not been convicted of a crime such

that no punishment of any kind is permitted).[3]   "The Fourteenth Amendment guarantees pretrial detainees a right 'not to have their serious medical needs met with deliberate indifference on the part of the confining officials.'"   Dyer v. Houston, 955 F.3d 501, 506 (5th Cir. 2020)(quoting Thompson v. Upshur Cty., Tex., 245 F.3d 447, 457 (5th Cir. 2001)).   Among the Fourteenth Amendment rights guaranteed to pretrial detainees are the right to medical care and the right to protection from harm, including medical care for and protection from known suicidal tendencies.   See Garza v. City of Donna, 922 F.3d 626, 632 (5th Cir. 2019)(citations omitted); Partridge v. Two Unknown Police Officers of City of Houston, Tex., 791 F.2d 1182, 1187 (5th Cir. 1986)("A serious medical need may exist for psychological or psychiatric treatment, just as it may exist for physical ills. A psychological or psychiatric condition can be as serious as any physical pathology or injury, especially when it results in suicidal tendencies.").

As to the second classification (the nature of the challenged conduct) dictating how to analyze a § 1983 deliberate indifference claim, "[a] pretrial detainee may prove a constitutional violation

---

[3] That the plaintiff alleges Eighth Amendment violations and the parties brief the applicability of the Eighth Amendment is of no moment, considering that the plaintiff also correctly invokes the Fourteenth Amendment and the Fourteenth Amendment case literature concerning pretrial detainees is based on the Supreme Court's Eighth Amendment precedent concerning prisoners.   Any § 1983 claims based on the Eighth Amendment must be dismissed.

either by demonstrating an unconstitutional condition of confinement or by demonstrating an unconstitutional episodic act or omission." Cadena, 946 F.3d at 727 (citation omitted). When a plaintiff pursues an episodic-acts-or-omissions theory, she seeks to redress harms arising from "the particular act or omission of one or more officials," rather than conditions-of-confinement harms, which result directly from an institution's pervasive unconstitutional policy or practice (such as overcrowding, excessive heat, the use of disciplinary segregation). See Garza, 922 F.3d at 632 (citations omitted). Most frequently, jail suicide cases proceed on an episodic-act, rather than conditions-of-confinement, theory; however, custodial-suicide plaintiffs may pursue both as alternative theories. See id. at 633 and n.3.

The plaintiff's theory here appears limited to challenging CHL's and its employee's episodic act or omission in treating (or failing to treat) Williams's mental health and their failure to protect him from the harm presented by his suicidal ideation. In considering such a theory, the Court must "employ different standards depending on whether the liability of the individual defendant or the municipal defendant is at issue." Baughman, 935 F.3d at 307 (citation omitted). Regardless of whether municipal or individual liability is at stake, the plaintiff must show that officials acted with deliberate indifference; "an extremely high standard to meet." Id. (citation omitted). This "wanton" or

19

"recklessness" showing requires that "(1) the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and (2) he must also draw the inference." Id. (citations omitted); Dyer, 955 F.3d at 506. Municipal "as opposed to individual liability has the additional requirement that the 'violation resulted from a [municipal] policy or custom adopted and maintained with objective deliberate indifference.'" Baughman, 935 F.3d at 307 (quoting Garza, 922 F.3d at 634).[4]

As for the "substantial risk of serious harm" component of the first element, the Fourteenth Amendment guarantees that pretrial detainees have a right "not to have their serious medical

---

[4] Although there is some confusion in the case literature, the Fifth Circuit has recently clarified that -- no matter whether official or municipal liability is at issue -- there is no third requirement that the official subjectively intend the particular harm to occur. Dyer, 955 F.3d at 507; Garza, 922 F.3d at 635-36. The Court observes that there is another area of disagreement or confusion concerning the standard for deliberate indifference of pretrial detainees: whether the standard is subjective (the defendants knew of and disregarded a substantial risk of harm) or objective (the defendants knew or should have known of the risk of harm). Compare Alderson v. Concordia Parish Correctional Facility, 848 F.3d 415, 419-20 (5th Cir. 2017)(pretrial detainees must show subjective deliberate indifference) with Kingsley v. Hendrickson, 576 U.S. 389 (2015)(holding that an objective standard applied to whether force used against a pretrial detainee was excessive). The Court is bound to follow Alderson and other recent Fifth Circuit case literature specific to the serious medical needs context. See, e.g., Baughman, 935 F.3d at 307 (applying subjective deliberate indifference test to pretrial detainee's claim that certain medical and other officials acted with deliberate indifference towards his serious medical needs).

needs met with deliberate indifference." <u>Dyer</u>, 955 F.3d at 506.
A serious medical condition or need is equivalent to objective
exposure to a substantial risk of harm; such a condition or need
is "one for which treatment has been recommended or for which the
need is so apparent that even laymen would recognize that care is
required." <u>Carlucci v. Chapa</u>, 884 F.3d 534, 538-40 (5th Cir.
2018)(quoting <u>Gobert v. Caldwell</u>, 463 F.3d 339, 345 n.12 (5th Cir.
2006)); <u>Cadena</u>, 946 F.3d at 727-28.  "Medical treatment that is
merely unsuccessful or negligent does not constitute deliberate
indifference, 'nor does a prisoner's disagreement with his medical
treatment, absent exceptional circumstances.'"  <u>See</u> <u>Arenas v.</u>
<u>Calhoun</u>, 922 F.3d 616, 620 (5th Cir. 2019)(citations
omitted)(analogous Eighth Amendment convicted prisoner context).
Thus, a plaintiff "must show that the officials refused to treat
him, ignored his complaints, intentionally treated him
incorrectly, or engaged in any similar conduct that would clearly
evince a wanton disregard for any serious medical needs.'"  <u>See</u>
<u>id.</u> at 620-21 (citations omitted).  To be sure, "[p]rison officials
who actually knew of a substantial risk to inmate health or safety
may be found free from liability if they responded reasonably to
the risk, even if the harm ultimately was not averted." <u>Farmer v.</u>
<u>Brennan</u>, 511 U.S. 825, 844 (1994)(considering analogous Eighth
Amendment context).

As to the defendant's challenged conduct, it must be egregious: "[d]eliberate indifference is an extremely high standard to meet." <u>Dyer</u>, 955 F.3d at 506. It "cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." <u>Id.</u> (citations omitted). Deliberate indifference "requires that the defendant act with 'something more than negligence' but 'less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" <u>Cadena</u>, 946 F.3d at 728 (citation omitted). For example, "the decision whether to provide additional treatment 'is a classic example of a matter for medical judgment,' which fails to give rise to a deliberate-indifference claim." <u>Dyer</u>, 955 F.3d at 507 (citation omitted). Similarly, "mere disagreement with one's medical treatment" and "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice" fall short of deliberate indifference. <u>See</u> <u>id.</u> To act with deliberate indifference, an official must "know[] of and disregard an excessive risk to inmate safety." <u>Garza</u>, 922 F.3d at 635 ("It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.") (citations omitted).

III.

*A.*

Before reaching the substantive heart of the defendants' motion to dismiss, the Court takes up several preliminary issues. First, the parties appear to concede that the state action and under color of law elements of the plaintiff's § 1983 claim are sufficiently alleged.  That is, notwithstanding their ostensible private actor status, the parties agree that CHL and CHL employees are potentially liable for their own acts and omissions as state actors under color of state law by reason of CHL's contract with the LPDC.  The Court foregoes a public-function analysis to resolve the state-actor inquiry because there is no dispute that the plaintiff plausibly alleges that the state (through the LPSO or LPDC) must provide adequate medical care to pretrial detainees and that function was delegated to CHL and its employees, which assumed the LPDC's obligation by contract.  In other words, if the plaintiff alleges a constitutional deprivation by the private medical care defendants, the deprivation occurred at the hands of state actors under color of state law because CHL's policies and its employees' actions are fairly attributable to the state.  It is settled that "[p]rivate actors may, under some circumstances, be liable under § 1983[.]" Perniciaro v. Lea, 901 F.3d 241, 251 (5th Cir. 2018)(citing West v. Atkins, 487 U.S. 42, 54 (1988)("We now make explicit what was implicit in our holding in Estelle: ...

23

a physician employed by [the state] to provide medical services to state prison inmates, act[s] under color of state law for purposes of § 1983 when undertaking his duties in treating [a state inmate's] injury. Such conduct is fairly attributable to the State.")).  When a state or municipality contracts with a private party to administer healthcare to inmates or detainees, the private party and its employees administer the medical services under color of state law (because they perform a public function by providing medical care to individuals in state custody) and therefore may be sued as state actors.  See West, 487 U.S. at 55-56.  These principles apply to CHL and its employees.  For these reasons, the CHL defendants do not appear to dispute that the state action and under color of law requirements are not a basis for dismissal.

Second, the plaintiff concedes in her opposition papers that there is no vicarious liability under 42 U.S.C. § 1983.  Indeed, § 1983 does not create supervisory or respondeat superior liability.  See Connick v. Thompson, 536 U.S. 51, 60 (2011); Monell v. New York City Dept. of Social Services, 436 U.S. 658, 691, 692-94 (1978).  Insofar as the plaintiff attempts to hold CHL vicariously liable for its employees' alleged constitutional violations, as alleged as part of Count 3 of the complaint, any such claim must be dismissed for failure to state a claim.[5]

---

[5] The parties agree that Monell liability may be extended to private entities acting under color of state law.  Assuming it may, see,

Third, the plaintiff concedes that the defendants' motion to dismiss should be granted as to Aysa Every.  Accordingly, the Court need not independently examine the sufficiency of the plaintiff's allegations against this defendant; the defendants' motion is granted as unopposed as to Aysa Every.

Finally, the defendants urge the Court to consider Williams's medical records in determining whether the plaintiff states a claim.  Even assuming that the Court may consider the contents of the medical records as "central to the plaintiff's claims" without converting the motion to dismiss to one for summary judgment, the Court declines the defendants' invitation to resolve certain alleged ambiguities in the records in favor of the defendants. That the defendants invoke cases resolving deliberate indifference claims on summary judgment are not helpful to the Court's task here.  Now is not the time to resolve factual disputes; the test at the pleadings stage juncture is whether a claim has been stated, not proved.

---

e.g., Shields v. Illinois Dep't of Corrs., 746 F.3d 782, 786 (7th Cir. 2014), Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1139 (9th Cir. 2012), and Lyons v. Nat'l Car Rental Sys., Inc., 30 F.3d 240, 246 (1st Cir. 1994), the Court considers below whether the plaintiff states a plausible Monell claim against CHL.

*B.*

The Court addresses the sufficiency of the allegations of the medical defendant officials' individual liability before assessing the allegations concerning CHL's <u>Monell</u> liability.

CHL employees David Jennings, Kendra Patrick, Patricia Guidry, Katasha Morris, Shanta Sherman, Sarah Armond, and Chelsea Nolan are sued in their individual capacities.   In moving to dismiss the plaintiff's deliberate indifference claims, they advance three main arguments.   First, the defendants contend that conclusory collective pleading fails to state any claim as to each individual defendant.   Second, they contend that certain allegations are contradicted by the medical records.   And, third, they contend that they provided care to Williams and the plaintiff simply disagrees over the type of care provided.   The plaintiff counters that the complaint adequately individualizes claims against each defendant, the medical records support the alternatively theories advanced in the complaint, and the plaintiff sufficiently alleges that the individual CHL defendants documented Williams's mental health status, but failed to treat him.

As previously summarized, pretrial detainees like Williams have a Fourteenth Amendment right to be protected from impermissible punishment like denials of, or delays in, providing medical care for serious medical needs.   As put plainly by the

Fifth Circuit Pattern Jury Instructions, to recover damages for such a violation, the plaintiff must prove by a preponderance of the evidence that: (1) the plaintiff was exposed to a substantial risk of serious harm; (2) the defendant displayed deliberate indifference to that risk; and (3) the deliberate indifference harmed the plaintiff.  If a reasonable person would view Williams's alleged mental illnesses and suicidal ideation as sufficiently serious based on all of the alleged circumstances, then the first requirement is met.  See id.  Proof of egregious conduct is required to meet the second element:  the plaintiff must prove that the defendant knew of and disregarded an excessive risk to Williams's mental health or safety (risk of self-harm from suicide).  See id.  (noting the two-prong test plaintiff must prove: (1) the defendant was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed; and (2) the defendant actually drew that inference).  Mere disagreement with the type, amount, or timing of medical treatment is insufficient.  Id.  For an episodic-act-or-omission claim "relying on an alleged denial or delay of medical care," the plaintiff may prove "deliberate indifference by demonstrating that an official 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in similar conduct that would clearly evince a wanton disregard for any serious medical needs.'"  Baughman, 935 F.3d at 309 (quoting

27

Perniciaro v. Lea, 901 F.3d 241, 258 (5th Cir. 2018)).   Each defendant's alleged conduct is examined individually.   Id. (citation omitted).

"Suicide is an objectively serious harm implicating the state's duty to provide adequate medical care" and protection from harm.   See Arenas v. Calhoun, 922 F.3d 616, 621 (5th Cir. 2019)(citation omitted).   Although it is established that "jailers must take measures to prevent inmate suicides once they know of the risk," the Fifth Circuit has observed that there is a lack of "clarity as to what those measures must be."   See Hyatt v. Thomas, 843 F.3d 172, 177-78 (5th Cir. 2016).   If an officer or medical provider responds without the due care a reasonable person would use, the officer acted merely negligently and no liability attaches.   See id.   Given that "suicide is inherently difficult ... to predict, particularly in the depressing prison setting[,] an incorrect diagnosis regarding the genuineness of a suicide threat does not amount to deliberate indifference."   Young v. McCain, 760 Fed.Appx. 251, 256 (5th Cir. 2019)(citing Domino v. Texas Dep't of Criminal Justice, 239 F.2d 752, 756 (5th Cir. 2001)).

The defendants do not appear to dispute that the plaintiff alleges facts that, if proved, indicate that certain individuals were aware that Williams had serious medical needs (insofar as he indicated to some that he suffered from mental illness and as

manifested in suicide risk and express suicidal ideation) and knew that he was a known suicide risk. Certain allegations differentiate individual CHL defendants: it is alleged that either Sherman or Guidry originally placed Williams on suicide watch on September 18, 2018 because he stated he wanted to kill himself. Seven days later, Williams was interviewed by Armond or Jennings at which time he reported feeling suicidal, depressed, hopeless, having been diagnosed with bipolar disorder and schizophrenia, and having previously been prescribed medications to treat his mental health issues. It is alleged that that same day (September 25) Nolan either requested (with Williams's authorization) or alternatively requested and also received Williams's prior mental health treatment records from a facility where Williams had been treated, which confirmed his mental health history, diagnoses, treatment, and medications. Two days later, it is alleged that Patrick noted that Williams -- who had by then been on suicide watch for 9 days -- reports being depressed and suicidal as well as bipolar and schizophrenic and unmedicated; Patrick made a Mental Health Note to "keep [Williams] on suicide watch obtain records from Jeff Carrol [sic] rtc 1 week." Five days later on the morning of October 2, Williams was examined by Jennings, who noted in the interview form that Williams "was definitive in his denial of [suicide ideation] or wanting to hurt himself," that Williams reported his diagnostic history of bipolar disorder and

29

schizophrenia and that he was receiving an Invega shot until a few months ago, and that Williams stated that he had "support from family and hope for his future." Jennings made the decision to discontinue suicide watch; he made a Mental Health Note and Provider Order stating "[d]iscontinue suicide watch, house per security, verify meds, psych appointment, f/u in one week by social worker[.]" Williams was removed from suicide watch and placed in D Block then moved to E Block on October 5 after a problem with another inmate. In the afternoon of October 5, Nolan indicated "SUICIDAL IDEATIONS MENTAL HEALTH" in Williams's chart next to "Medical Problems," including "current," "extended," and "all" medical problems. Nolan also indicated "NONE" for medications and as to "Outstanding Appts[,]" she indicated "Appointment with Appt: MenHlth Sick Call-Prov for 10-09-2018: f/u social worker in one week Appointment with Appt: Mental Health Provider (NP_PA) for 10-11-2018: VERIFY MEDS, PSYCH APPOINTMENT UPON VERIFICATION." But none of the defendants verified Williams's medications or stated diagnoses, prescribed or administered medications he had previously received, and no psychologist or psychiatrist ever evaluated Williams before he killed himself on October 7, 2018.

Viewing the allegations in the light most favorable to the plaintiff, Williams presented a serious mental health need and need for protection from self-harm. Satisfying the plausibility standard as to the first element. Williams reported to more than

one CHL defendant (Sherman, Guidry, Armond, Jennings, and Patrick) that he was bipolar and schizophrenic, off his meds, depressed, and suicidal.    Whether because treatment was previously recommended for Williams (as he indicated to some CHL medical staff, even if they failed to confirm it) or because even laymen would recognize mental health care was indicated, the plaintiff has alleged facts indicating that Williams had a serious medical condition or objective exposure to a substantial risk of harm. See Carlucci, 884 F.3d at 538-40; Cadena, 946 F.3d at 727-28.

The plaintiff alleges a constitutional deprivation under § 1983 if facts are alleged indicating that Williams's serious medical needs were met with deliberate indifference.    With the exception of Jennings, the defendants contend that the plaintiff fails to allege facts attributing deliberately indifferent conduct to specific defendants.    Jennings contends that the plaintiff's deliberate indifference allegations concerning his conduct sound merely in negligence.    The Court agrees that the plaintiff fails to allege facts indicating deliberate indifference on the part of Kendra Patrick, Patricia Guidry, Katasha Morris, Shanta Sherman, Sarah Armond, and Chelsea Nolan.    But the Court disagrees that the plaintiff alleges merely unactionable negligence against Jennings.

Most of the plaintiff's allegations improperly lump the defendants together and fail to allege which defendants knew of the substantial risk to Williams and which defendants failed to

take reasonable measures to respond to the substantial risk of suicide. For example, as to Morris, the plaintiff merely alleges that she was one of several CHL employees charged with observing Williams while he was on suicide watch. What's missing are facts specific to Morris as to how she exhibited deliberate indifference to Williams. Similarly, the plaintiff's allegations as to the other CHL individual defendants fail to offer an alleged factual predicate of deliberately indifferent conduct. Shanta Sherman is alleged to have placed Williams on suicide watch; Kendra Patrick is alleged to have kept Williams on suicide watch after Williams stated he was still suicidal and she also noted the need to obtain mental health records; Patricia Guidry is alleged to have placed Williams on suicide watch; Sarah Armond is alleged to have interviewed Williams about suicidal ideation; and Chelsea Nolan is alleged to have originally requested JeffCare records and, after suicide watch was discontinued, she allegedly noted outstanding appointments and mental health issues in chart. Without concrete facts indicating how each exhibited deliberate indifferene to Williams, these allegations are merely part of the chronology contextualizing Jennings's alleged constitutional violation. The plaintiff concludes that the defendants "documented Williams's mental status but didn't treat him." But the plaintiff fails to allege facts indicating how each of the CHL defendants (except Jennings) recklessly disregarded Williams's suicide risk or

recklessly failed to treat his serious mental health issues. Allegations that the defendants (collectively) should have obtained his mental health history records, should have had Williams evaluated by a mental health professional such as a psychologist or psychiatrist, should have administered prescribed medications are conclusory group allegations, which fail to state plausible individual capacity claims.

In spite of Williams's self-reported mental health issues, plaintiff alleges that the CHL defendants either confirmed or failed to confirm his diagnoses by promptly obtaining his medical records; failed to have him promptly examined by a mental health expert such as a psychologist or psychiatrist; failed to have his medication evaluated; and took an unmedicated mentally ill pretrial detainee's word for it when he stated (after weeks of depression and suicidal ideation) that he was no longer contemplating suicide. This, the plaintiff contends, constitutes a failure to treat known mental health issues. To be sure, "just as a failure to act to save a detainee from suffering from gangrene might violate the duty to provide reasonable medical care ... failure to take any steps to save a suicidal detainee from injuring himself may also [violate] due process[.]" Partridge v. Two Unknown Police Officers of City of Houston, Tex., 791 F.2d 1182, 1187 (5th Cir. 1986). If some individuals denied or delayed a psychological or psychiatric evaluation or delayed in confirming

Williams's diagnoses, or delayed in providing him with treatment (including prescription medications previously prescribed to ameliorate his bipolar and schizophrenic symptoms) such conduct may constitute deliberate indifference. Carlucci, 884 F.3d at 538 ("A delay in medical treatment that results in substantial harm [may] constitute deliberate indifference."). However, because the plaintiff fails to allege which CHL individuals disregarded known risks, refused to treat him, ignored his complaints, or engaged in similar conduct evincing a wanton disregard for Williams's serious mental health needs, the plaintiff's claims against Kendra Patrick, Patricia Guidry, Katasha Morris, Shanta Sherman, Sarah Armond, and Chelsea Nolan must be dismissed; the Court will permit an amendment to the complaint within fourteen days if the plaintiff in good faith believes that it is possible to cure the pleading deficiencies as to these defendants.

The plaintiff's allegations pertaining to Jennings are the exception; his alleged deliberate indifference is specific to his cumulative knowledge and conduct. By discontinuing suicide watch for Williams, notwithstanding the circumstances indicating a suicide threat, it is alleged that he was deliberately indifferent to Williams's serious medical need. Jennings frames his conduct in a limited fashion: making one decision concerning Williams's mental health treatment. But the plaintiff's narrative sweeps more broadly, framing Jennings's conduct as a culmination of

failures in the context of Jennings's specific knowledge regarding Williams's mental illness and vulnerability to suicide. Viewed collectively, and in the light most favorable to the plaintiff, the plaintiff alleges that Jennings disregarded a known risk and was deliberately indifferent to Williams's serious medical needs.[6]

It is alleged that Jennings knew that Williams self-reported as schizophrenic, bipolar, depressed, suicidal, and being off his medications (after he self-reported as not being suicidal and

---

[6] Jennings contends that he did not know that Williams posed a substantial risk of suicide because Williams told Jennings he was no longer suicidal. Again, the Court reminds the defendants that this is the pleadings stage: it suffices that the plaintiff alleges circumstantial facts that permit an inference of subjective knowledge; here, the plaintiff alleges that Jennings knew that Williams had reported feeling suicidal and depressed (indeed, it is alleged Williams so reported to Jennings), that Williams was unmedicated, had not been evaluated by a mental health professional for weeks while on suicide watch at LPDC, and that he reported having a mental health history including diagnoses of bipolar disorder and schizophrenia. These allegations indicate that Jennings knew that Williams indeed posed a substantial risk of suicide even if Williams equivocated as to suicidal ideation and ultimately told Jennings he felt hopeful. The defendants' singular focus on Jennings's decision and their characterization that a wrong decision may merely be negligent disregards the plaintiff's other allegations indicating (Jennings's specific knowledge regarding) an absence (or denial) of treatment or reasoned evaluation of Williams's suicide risk: the plaintiff alleges that Jennings merely spoke briefly with Williams and cleared him of suicidal ideation based on Williams's self-serving statement that he was no longer feeling suicidal, without corroborative information or investigation; that is, it is alleged, Jennings failed to confirm his serious mental health diagnoses, failed to confirm (let alone prescribe) medications taken for mood disorder and schizophrenia, and knew that Williams was unmedicated and had not been seen by a mental health professional like a psychologist.

having no mental health history on intake).  In spite of this alleged knowledge and the knowledge that Williams had not yet been examined by a mental health professional despite being on suicide watch for weeks, had not had his alleged serious mental health diagnoses confirmed by a prior facility, had not been prescribed mood stabilizing or other medication since arriving at LPDC, Jennings elected to discontinue suicide watch based solely on Williams's indication that he was no longer suicidal.  Cumulating the plaintiff's factual allegations and considering the chronology, this was not merely a medical professional wrongly accepting the genuineness of Williams's suicidal ideation; rather, it is an allegation that Jennings acted with deliberate indifference to the substantial risk of suicide posed by Williams.

The Court recognizes that the plaintiff's complaint is far from exemplary, and at times provides conclusory statements or invokes the technically incorrect governing constitutional law (Eighth Amendment versus Fourteenth Amendment).  However, given the alleged facts, taken as true, which plausibly indicate that Williams was essentially untreated in spite of the serious risk of self-harm this lack of treatment posed to an unmedicated person suffering from bipolar disorder and schizophrenia, the determination of whether the defendants acted with deliberate indifference is a factual matter best assessed when the parties have had the opportunity to develop their claims and submit

evidence.  Cf. Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995)(citation omitted)("Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.").  The Court is satisfied that the plaintiff has sufficiently alleged facts that state a plausible claim to survive this motion to dismiss as to Jennings and that an opportunity for the plaintiff to timely amend the complaint is warranted as to other CHL defendants.

*C.*

CHL moves to dismiss the plaintiff's claim against it as an entity.  Whether the plaintiff states a § 1983 claim against CHL is analyzed in accordance with the Monell framework.

The Court has already observed (and the plaintiff does not dispute) that there is no *respondeat superior* liability under § 1983; no entity may be liable simply because it employs a person who has violated the plaintiff's rights.  As a private entity that acts under color of state law in contracting with the municipality to provide medical services to detainees, CHL is treated as a municipality for the purposes of § 1983 claims.[7]

---

[7] The Circuits to have considered the issue agree that, where private entities act in the place of a municipality, Monell applies.  See, e.g., Shields v. Illinois Dep't of Corrs., 746 F.3d 782, 786 (7th Cir. 2014); Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1139 (9th Cir. 2012); Lyons v. Nat'l Car Rental Sys., Inc., 30 F.3d 240, 246 (1st Cir. 1994); Buckner v. Toro, 116 F.3d 450, 452 (11th Cir. 1997).

Municipalities (or private entities acting in their places) are "persons" for purposes of § 1983 and may be liable where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Department of Social Servs. of New York, 436 U.S. 658, 663, 690 (1978).  Imposition of § 1983 liability against a municipality under Monell is appropriate in the limited circumstance of when a constitutional tort is caused through the execution of a policy or custom of the municipality. See Bowen v. Watkins, 669 F.2d 979, 989 (5th Cir. 1982)(citation omitted). Municipalities or such private entities may also be sued for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Monell, 436 U.S. at 690-91.  A municipality is not liable for injuries "inflicted solely by its employees or agents[; rather] it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694.

The test for establishing municipal liability in an episodic-act-or-omission case is settled:

> [A] plaintiff must show (1) that the municipal employee
> violated [the pretrial detainee's] clearly established
> constitutional rights with subjective deliberate
> indifference; ... (2) that this violation resulted from
> a municipal policy or custom adopted and maintained with
> objective deliberate indifference[; and (3)] either
> written policy statements, ordinances, or regulations or
> a widespread practice that is so...well-settled as
> to...fairly represent[] municipal policy that was the
> moving force behind the violation.

Cadena, 946 F.3d at 727 (citations, internal quotations omitted); Garza, 922 F.3d at 637 ("[T]o establish municipal liability based on an employee's episodic act or omission, a plaintiff must show the violation 'resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference.'").

To survive a motion to dismiss, the complaint must describe the policy and its relationship to the underlying constitutional violation with specific facts. Balle v. Nueces County, 952 Fed.Appx. 552, 559 (5th Cir. 2017)(unpublished)(quoting Spiller v. City of Tex. City, Police Dep't., 130 F.3d 162, 167 (5th Cir. 1997). "Thus, pleadings are sufficient when they make specific factual allegations that allow a court to reasonably infer that a policy or practice exists and that the alleged policy or practice was the moving force behind municipal employees' deliberate indifference to an inmate's serious medical needs." Id.[8]

---

[8] The Fifth Circuit does not necessarily require a complaint to state an unconstitutional policy. The court has found a complaint sufficient if it identifies a rule requiring the jails to provide

CHL contends that the plaintiff's <u>Monell</u> claim fails to state a claim because the plaintiff cannot establish deliberate indifference to Williams's medical needs; the plaintiff's allegations regarding failure to monitor, train, or supervise are merely conclusory; and alleged incidents at other jails have no bearing on CHL's <u>Monell</u> liability in this case. The Court agrees that the plaintiff's failure to train allegations fall short of the substantive legal requirements and that the plaintiff's

---

efficient medical treatment and describes a pattern of behavior where the reasonable inference is that the municipality violated that rule. For example, in <u>Balle</u>, the Fifth Circuit held that the plaintiff's § 1983 complaint sufficiently pled facts supporting a municipality liability claim. <u>Id.</u> at 559-60. The plaintiff was injured by an officer during arrest, and during his six-day detention received little medical attention despite his multiple requests for medical treatment, his apparent inability to control his bodily functions, and frequent muscle spasms. <u>Id.</u> at 560. After he was finally transported to the hospital, he was diagnosed with various back injuries, underwent surgery, but was still unable to walk. <u>Id.</u> The plaintiff alleged that the county had failed to enforce jailing policies mandated by a Texas Commission that requires jails to implement procedures for prompt and efficient care in acute situations. <u>Id.</u> at 559. The complaint alleged that when the plaintiff soiled himself from not being able to control his bodily functions the staff cleaned him and gave him a change of clothes without providing him medical attention. <u>Id.</u> at 560. Similarly, when he complained that he was paralyzed and could not walk, he was not given medical attention until the following day and even then, he was cleared with little follow-up. <u>Id.</u> The Fifth Circuit held that these incidences evidence a "pattern of failure [that] defied state law requiring that [the] county implement procedures to efficiently and promptly treat inmates." <u>Id.</u> From the complaint's allegations of consistent wrongdoing, the court determined that "[r]easonable inferences can be drawn that [the] county had an unwritten policy . . . that fairly represents municipal policy of consistent noncompliance with required state medical standards and that this policy or practice of noncompliance was the moving force behind the constitutional injuries[.]" <u>Id.</u>

reliance on other private entities' actions at other detention facilities does not assist the plaintiff in attempting to state a Monell claim.   However, the Court has already rejected the defendants' argument that the plaintiff fails to state a predicate individual deliberate indifference claim.   The plaintiff has stated a deliberate indifference claim against Jennings and the plaintiff will be afforded the opportunity to repair the deficiencies as to the other CHL individual defendants.   The plaintiff shall have the same opportunity to state a plausible Monell claim against CHL.

The plaintiff contends that the Monell claim is sufficiently pled; the plaintiff has alleged facts showing a pattern of sloppy, deliberately indifferent treatment of Williams by all of the CHL defendants.   The deliberately indifferent conduct began as soon as Williams advised that he was suicidal.   CHL failed to obtain his prior medical records, failed to follow jail protocol to have Williams examined by a psychiatrist after he advised that he was suicidal, limited his exam to one interview by a nurse practitioner before his interview by social worker Jennings, failed to medicate Williams, failed to refer him back to suicide watch, failed to refer him to a psychiatrist or the ER on October 5 when he reiterated his suicidal ideation, and there is a lack of post-suicide-watch monitoring and insufficient staffing.   These deficiencies, the plaintiff contends, demonstrate CHL's

41

unconstitutional policies related to training, supervision, staffing, and monitoring.

To assess the sufficiency of the plaintiff's Monell claim, the Court considers the plaintiff's allegations pertaining to Monell liability. The plaintiff alleges that the following "policies and practices" were established and maintained knowing they would deprive Williams of treatment for his serious mental health disorders: "failing to provide a qualified mental health staff; failing to provide a sufficient number of qualified mental health providers; failing to ensure that psychiatrists cleared patients off of suicide watch; failing to properly supervise and train its employees; failing to provide supportive therapy and interaction to patients on suicide watch; failing to provide appropriate suicide step-down and follow up plans; failing to have a policy in place to monitor its staff to ensure quality control and ensure prior health care records are shared and read on a daily basis to ensure that the staff knows a patient's prior mental health history and medication needs."

Because the plaintiff fails to allege a formal policy statement announced by a policymaker, any Monell liability must be anchored to a persistent widespread practice so common and well-settled that it fairly represents CHL policy. Given that the prior incidents the plaintiff invokes in the complaint to indicate CHL policy did not occur on CHL's watch at LPDC, the plaintiff is left

42

with conclusory allegations of a policy based solely on Williams's experience with CHL.  This undermines the plaintiff's ability to allege a pattern, which not only requires "sufficiently numerous prior incidents[,]" McConney v. City of Houston, 863 F.2d 1180, 1184 (5th Cir. 1989), but also "requires similarity; prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question." See Peterson v. City of Fort Worth, 588 F.3d 838, 850-51 (5th Cir. 2009)(citation, internal quotations omitted).  Similarly, the plaintiff's allegations that CHL failed to adopt certain policies, without concrete facts in support, are insufficient to indicate the plausibility of the plaintiff's claim that CHL failed to adopt the needed policy or that it did so with deliberate indifference.

Finally, the plaintiff's failure to train theory fails the plausibility test where, as here, the plaintiff fails to identify a particular deficiency in the training program that is related to Williams's constitutional injury.  "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy[.]" Connick v. Thompson, 563 U.S. 51, 61 (2011).  But, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Id. (citation omitted).  The plaintiff must allege a pattern of violations in addition to how a particular

43

training program is defective.  See Estate of Davis v. City of N. Richland Hills, 406 F.3d 375, 381 (5th Cir. 2005).  Absent notice that a training course is insufficient, it cannot be said that an entity has deliberately chosen a particular training program; thus, it is the entity's "policy of inaction in light of notice that its program will cause constitutional violations [that] is the functional equivalent of a decision by the city itself to violate the constitution."  Connick, 563 U.S. at 61-62 (citing City of Canton v. Harris, 489 U.S. 378, 395 (1989)).

To be sure, the plaintiff's allegations imply that cumulative errors and failures contributed to Williams's suicide and evince a concern that CHL may escape liability by diffusing responsibility across its employees.  Because the plaintiff alleges that at least one CHL employee was deliberately indifferent to Williams's serious medical needs and the plaintiff further alleges (albeit broadly) that systemic deficits and inadequate training in CHL's mental healthcare treatment program harmed Williams's mental health and led to his death, the plaintiff will have the opportunity to amend its deficient policy-or-custom allegations.

IV.

Finally, CHL and its employees move to dismiss without prejudice the plaintiff's state-law negligence claims. Alternatively, they seek to stay this case pending the outcome of the medical review panel currently pending in the state agency.

The plaintiff concedes that the medical malpractice and vicarious liability claims (Counts 6 and 7) require exhaustion before the state medical review panel; a process that is underway but not final.  The plaintiff also concedes that the medical malpractice claims arise from the same set of facts giving rise to the plaintiff's constitutional claims.  Nevertheless, the plaintiff worries that dismissal of only the medical malpractice claims would result in two suits in two courts regarding the same underlying facts.  The plaintiff urges the Court to either (a) stay only the medical malpractice portion of the case pending completion of the medical review panel or (b) dismiss without prejudice to allow for the rejoinder of the medical malpractice claims after completion of the medical review panel.  Only a partial stay is warranted here, the plaintiff suggests, because a complete stay would prejudice the parties by impeding discovery and timely resolution of the claims.

In Evans v. Lopinto, No. 18-8972, the plaintiffs allege that various law enforcement and medical defendants' deliberate indifference led to a pretrial detainee's death by suicide.  There, another Section of Court determined that a stay of the entire litigation pending the conclusion of the medical review panel furthered the interest of judicial economy.  See 2019 WL 2995870, at * (E.D. La. July 8, 2019)(Brown, C.J.).  So, too, here.

Each of the plaintiff's claims, including the state-law medical malpractice claims, arise out of Williams's suicide while he was detained at LPDC under the defendants' supervision and in the defendants' care. Discovery will apply to all interrelated claims. Additionally, the medical review panel's determination may be admissible (though not conclusive) evidence at any trial of this matter. See Seoane v. Ortho Pharmaceuticals, Inc., 660 F.2d 146, 149 (5th Cir. 1981). A stay of this case pending the outcome of the medical review panel is warranted. However, the Court shall entertain the implementation of the stay pending timely submission of any amended complaint and completion of the pleadings stage.

***

Accordingly, for the foregoing reasons, IT IS ORDERED: that the medical defendants' motion to dismiss is GRANTED in part (the plaintiff's § 1983 claims based on the Eighth Amendment are dismissed; the plaintiff's § 1983 claim against Aysa Every is dismissed; the plaintiff's claim that CHL is vicariously liable under § 1983 is dismissed; the plaintiff's § 1983 claims against Kendra Patrick, Patricia Guidry, Katasha Morris, Shanta Sherman, Sara Armond, and Chelsea Nolan are dismissed without prejudice to the plaintiff's effort to timely cure the pleading deficiencies; the plaintiffs Monell claim against CHL is dismissed without prejudice to the plaintiff's effort to timely cure the pleading deficiencies) and DENIED in part (the plaintiff's § 1983 claim

against David Jennings in his individual capacity remains pending). IT IS FURTHER ORDERED: that, within 14 days, the plaintiff shall have the opportunity to file an amended complaint to address the pleading deficiencies identified in this Order and Reasons, if it can be done in good faith.

New Orleans, Louisiana, June 17, 2020

_____

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE